Maria C. ZAMARRON, Individually, as Guardian of the Person and Estate of Juan Francisco Zamarron, an Incapacitated Person, and a/n/f Sonia Janeth Zamarron, a Minor, and Anton & Carroll, Inc. d/b/a Inland Machine, Appellants,

v.

**SHINKO WIRE COMPANY, LTD., Appellee.**

No. 14–03–00063–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 26, 2003.

Rehearing Overruled Jan. 29, 2004.

Randy L. Fairless, Sugar Land, James B. Lewis, Houston, for appellants.

Matthew Graham Zagrodzky, Houston, for appellees.

Panel consists of Justices YATES, HUDSON, and FROST.

## OPINION

J. HARVEY HUDSON, Justice.

In this interlocutory appeal, Maria C. Zamarron, Individually, as Guardian of the Estate of Juan Francisco Zamarron, an Incapacitated Person, and as next friend for Sonia Janeth Zamarron, a Minor (collectively, "the Zamarrons"), and Anton & Carroll, Inc., doing business as Inland Machine, appeal the trial court's order granting Shinko Wire Company, Ltd.'s ("Shinko Japan") special appearance. We affirm.

### I. BACKGROUND

On January 13, 1999, Juan Francisco Zamarron was operating a wire drawing machine, designated as "D–103," on the premises of American Spring Wire Corp. in Houston. While Zamarron was operating D–103, an upper bracket on an adjacent machine, D–102, broke—flinging a large metal pulley through the air, striking Zamarron in the head and causing permanent injuries.

Showa Machine Works, Ltd. ("Showa") manufactured wire drawing machine D–102 in 1975, and remodeled it in 1981. Shinko Wire America, Inc. ("Shinko America"), a subsidiary of Shinko Japan, owned the wire manufacturing plant and leased the wire machine from TohLease Corporation. Shinko America filed for dissolution on January 25, 1994, and became SWAI Corp. d/b/a Shinko Wire America, Inc. ("SWAI"). On December 31, 1996, SWAI sold all of its assets to American Spring Wire Corp.

The Zamarrons sued Shinko Japan for strict products liability and negligence, and alleged that Shinko Japan is the alter ego of SWAI and Shinko America.[1] Shinko Japan is a Japanese corporation with its

---

1. The Zamarrons also sued Inland Machine for negligence in repairing the upper and lower brackets.

principal place of business in Amagasaki City, Hyogo, Japan. Asserting that it lacks sufficient contacts with Texas, Shinko Japan filed a special appearance, which the trial court granted.[2]

## II. STANDARD OF REVIEW

The plaintiff has the initial burden of pleading sufficient allegations to bring the nonresident defendant within the provisions of the Texas long-arm statute. *American Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002), *cert. denied,* 537 U.S. 1191, 123 S.Ct. 1271, 154 L.Ed.2d 1025 (2003); *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 793 (Tex.2002). The nonresident defendant then has the burden of negating all bases of personal jurisdiction. *National Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 772 (Tex.1995). If the plaintiff does not plead jurisdictional allegations, *i.e.,* that the defendant has committed any act in Texas, the defendant can satisfy its burden by presenting evidence that it is a nonresident. *Hotel Partners v. KPMG Peat Marwick,* 847 S.W.2d 630, 634 (Tex. App.-Dallas 1993, writ denied).

Whether the court has personal jurisdiction over a nonresident defendant is a question of law, but the proper exercise of such jurisdiction is sometimes preceded by the resolution of underlying factual disputes. *Coleman,* 83 S.W.3d at 805–

06; *BMC Software,* 83 S.W.3d at 794; *C–Loc Retention Sys., Inc. v. Hendrix,* 993 S.W.2d 473, 476 (Tex.App.-Houston [14th Dist.] 1999, no pet.). Here, the trial court made no findings of fact and conclusions of law.[3] All questions of fact, therefore, are presumed to be found in support of the judgment. *Coleman,* 83 S.W.3d at 806; *BMC Software,* 83 S.W.3d at 795. When the appellate record includes the reporter's and the clerk's records, the implied findings are not conclusive and may be challenged for legal and factual sufficiency. *D.H. Blair Inv. Corp. v. Reardon,* 97 S.W.3d 269, 273 (Tex.App.-Houston [14th Dist.] 2002, pet. dism'd w.o.j.).

## III. TEXAS LONG-ARM STATUTE

A Texas court may exercise jurisdiction over a nonresident if two conditions are satisfied. First, the Texas long-arm statute must authorize the exercise of jurisdiction. Second, the exercise of jurisdiction must be consistent with federal and state constitutional guarantees of due process. *Coleman,* 83 S.W.3d at 806; *Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990).

The Texas long-arm statute authorizes the exercise of jurisdiction over a nonresident defendant who does business in Texas. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). While the statute enumerates several specific acts constitut-

---

**2.** Showa, whose principal place of business is located in Japan, filed a special appearance, which the trial court also granted. The Zamarrons have not appealed from the granting of Showa's special appearance.

**3.** In their reply brief, the Zamarrons, while acknowledging they requested that the trial court make findings of fact and conclusions of law, state the trial court declined to do so. The record does not show that the Zamarrons filed a *notice of past due* findings of fact and conclusions of law pursuant to Rule 297 of the Rules of Civil Procedure. *See* TEX.R. CIV.

P. 297 (providing, in relevant part, that if trial court fails to file timely findings of fact and conclusions of law, requesting party shall, within thirty days after filing original request, file "Notice of Past Due Findings of Fact and Conclusions of Law"). By failing to file a notice of past due findings of fact, the Zamarrons have waived their complaint, if any, on appeal, concerning the trial court's failure to make findings of fact and conclusions of law. *See Curtis v. Commission for Lawyer Discipline,* 20 S.W.3d 227, 232 (Tex.App.-Houston [14th Dist.] 2000, no pet.).

ing "doing business," it also includes any "other acts that may constitute doing business." *Schlobohm,* 784 S.W.2d at 357.[4] The "doing business" requirement permits the statute to reach as far as the federal constitutional requirements of due process will allow. *Guardian Royal Exchange Assur., Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991).

## IV. DUE PROCESS

■ Due process consists of two components: (1) whether the nonresident defendant has purposefully established "minimum contacts" with the forum state; and (2) if so, whether the exercise of jurisdiction comports with "fair play and substantial justice." *Id.* (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

■ Under the minimum contacts analysis, we must determine whether the nonresident defendant has purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of the state's laws. *Coleman,* 83 S.W.3d at 806. A nonresident defendant who has purposefully availed itself of the privileges and benefits of conducting business in the forum state has sufficient contacts with the forum to confer personal jurisdiction on the court. *CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996). The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court. *Coleman,* 83

S.W.3d at 806. The purposeful availment requirement insures that the nonresident defendant's contact must result from its purposeful contact, not the unilateral activity of the plaintiff or a third party. *Guardian Royal Exchange,* 815 S.W.2d at 227.

■ In determining whether a nonresident defendant has purposefully established minimum contacts with the forum state, "foreseeability" is a significant consideration. Although not an independent component of the minimum contacts analysis, foreseeability is implicit in determining whether there is a "substantial connection" between the defendant and the forum state. If a nonresident, by its actions or conduct, has purposefully availed itself of the state's benefits and the protections of its laws, then it has established a substantial connection with the state and subjected itself to the state's jurisdiction. *Conner v. ContiCarriers & Terminals, Inc.,* 944 S.W.2d 405, 410 (Tex.App.-Houston [14th Dist.] 1997, no writ) (citing *Guardian Royal Exchange,* 815 S.W.2d at 226–27). "Because of the unique and onerous burden placed on a party called upon to defend a suit in a foreign legal system, the minimum contacts analysis is particularly important when the defendant is from a different country." *BMC Software,* 83 S.W.3d at 795; *CSR Ltd.,* 925 S.W.2d at 595.

■ The nonresident defendant's contacts can give rise to two types of jurisdiction. The first is specific jurisdiction, which is established when the plain-

---

4. The Texas long-arm statute provides:
 In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:
 (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;

 (2) commits a tort in whole or in part in this state; or
 (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.
 TEX. CIV. PRAC. & REM.CODE ANN. § 17.042.

tiff's cause of action arises out of, or relates to, the defendant's contacts with the forum state. *Conner*, 944 S.W.2d at 410. For specific jurisdiction to exist, the defendant's activities must have been purposefully directed toward the forum state. *Guardian Royal Exchange*, 815 S.W.2d at 228. Under specific jurisdiction, the minimum contact analysis focuses on the relationship among the defendant, the forum, and the litigation. *Id.*

The second type of jurisdiction is general jurisdiction, which is established by the defendant's continuous and systematic contacts with the forum. Such contacts permit the forum to exercise personal jurisdiction over the defendant even if the cause of action did not arise from, or relate to, the defendant's activities conducted within the forum state. *Coleman*, 83 S.W.3d at 806; *CSR Ltd.*, 925 S.W.2d at 595. Under general jurisdiction, the minimum contacts analysis is more demanding, requiring a showing of substantial activities within the forum state. *Schlobohm*, 784 S.W.2d at 357.

## V. ADEQUACY OF THE AFFIDAVIT

As a preliminary matter, we must address the Zamarrons' assertion raised in their reply brief that the affidavit of Shigemasa Kataoka, a Shinko Japan officer, submitted in support of Shinko Japan's special appearance was not based on personal knowledge of relevant facts, not properly authenticated, or in proper form. After the Zamarrons objected to Kataoka's affidavit, Shinko Japan filed an amended affidavit with its brief in support of its special appearance. The Zamarrons contend that by filing its special appearance "without a proper sworn motion," Shinko Japan made a general appearance, thus, waiving its special appearance.

The Zamarrons waived this complaint by failing to raise it in their original appellate brief. *See* TEX.R.APP. P. 38.3; *In re A.M.*, 101 S.W.3d 480, 486 (Tex.App.-Corpus Christi 2002, pet. filed); *Barnes v. SWS Fin. Servs., Inc.*, 97 S.W.3d 759, 761 n. 3 (Tex.App.-Dallas 2003, no pet.); *JHC Ventures, L.P. v. Fast Trucking, Inc.*, 94 S.W.3d 762, 773 n. 9 (Tex. App.-San Antonio 2002, no pet.). In any event, even if the Zamarrons had not waived this issue, we conclude Shinko Japan did not waive its special appearance. Rule 120a provides that a special appearance "may be amended to cure defects." TEX.R. CIV. P. 120a. The rule "means to restore the special appearance" and does not limit the types of defects that may be cured. *Dawson–Austin v. Austin*, 968 S.W.2d 319, 322 (Tex.1998). Thus, under Rule 120a, Shinko Japan did not waive its special appearance by submitting an amended affidavit.

## VI. SPECIFIC JURISDICTION

Appellants assert that Texas courts have specific jurisdiction over Shinko Japan because its actions causing the accident and injuring Zamarron were purposeful contacts with Texas. The Zamarrons argue Shinko Japan engaged in the following purposeful acts: (1) it defectively designed the shield guard system on D–102, (2) it failed to install sufficient guarding on D–102, (3) it failed to warn about the dangers posed by the insufficient shield guarding on D–102, (4) it provided defective parts, and (5) it supervised the installation and placement of D–102 in close proximity to D–103.

In support of these allegations, appellants rely on the affidavit of Luis Rivera,[5]

---

**5.** According to Marvin Coppinger, plant manager at the time of the accident, the accident

was largely caused by the fact that Rivera left D–102 unattended; therefore, the machine

who claims to have operated D–102 from 1985 until 1999, and was operating D–102 at the time of the accident. According to Rivera, he regularly observed and spoke to engineers from Shinko Japan who visited the plant in Houston once or twice a year, at which time they inspected and worked on each machine, including D–102. Rivera specifically states that in 1994, Shinko Japan engineers designed and supervised the placement of new shield guarding on D–102. Rivera asserts that until the plant was sold in 1997, he complained to the Shinko Japan engineers about the safety of D–102 and asked them to place guarding on the back of D–102, but he was told that it would be too expensive to do so.

Appellants also rely on the deposition testimony of Oscar Trevino, a maintenance electrician employed by Shinko America during the time it owned the plant. Trevino testified that Shinko America obtained D–102 from Shinko Japan. According to Trevino, Shinko Japan engineers inspected the machines, including D–102, at the plant for proper design and installation (by outside contractors hired by SWAI), supervised the installation of the guarding on D–102, repaired the machines, approved his modifications, and went over maintenance schedules.

Marvin Coppinger testified that, as plant manager, he oversaw production, plant safety, hiring of employees, quality control, and some maintenance. According to Coppinger, before the plant was sold to America Spring Wire, D–102 had been shut down and was reactivated by American Spring Wire several months after it bought the plant. Coppinger explained that prior to American Spring Wire acquir-

ing the plant in 1997, Shinko America was responsible for the safety of the equipment, including D 102, but was not responsible for the equipment at the time of the accident.

With regard to Shinko Japan's involvement with the plant, Coppinger stated there was no set schedule for Shinko Japan's engineers to visit the plant—its engineers sometimes came two to three times a year, staying up to three weeks for each visit; however, some years its engineers did not visit the plant at all. Coppinger testified that while Shinko Japan's engineers visiting the plant oversaw installation performed by outside millwrights, assisted with problem solving (if in-house maintenance or an outside contractor could not solve the problem) and troubleshooting, and translated Japanese printouts, they were not involved in the day-to-day operations of the plant. To Coppinger's knowledge, no one from Shinko Japan performed any maintenance on D–102 or the other machines; instead, all maintenance work was performed by Shinko America employees or by outside contractors. Moreover, safety issues with regard to any of the machines would have been reported to Coppinger, and he received no reports of any safety problems with regard to D–102 that were not corrected prior to 1999.

In support of its special appearance, Shinko Japan submitted the affidavit of Shigemasa Kataoka, a Shinko Japan officer. According to Kataoka, Showa, not Shinko Japan, manufactured D–102. On or before January 1, 1994, D–102 had been deactivated and was not returned to service prior to the sale of SWAI's assets to American Spring Wire.[6] Kataoka states

---

was not being monitored and synchronized. Coppinger testified that the accident could have been prevented if D–102 had not been left unattended.

6. The list of fixed assets attached to the Asset Purchase Agreement covering the sale of SWAI's assets to American Spring Wire effective January 1, 1997, shows D–102 as an "unused machine."

Shinko Japan had no supervisory control over, or any responsibility for, D–102 and its employees did not inspect, repair, or service D–102 in 1995 or 1996, or anytime thereafter because SWAI had been sold and dissolved. Kataoka states Shinko Japan never managed the day-to-day operations of SWAI or Shinko America and, therefore, would not have repaired or replaced the guard system on D–102. Instead, any repairs to, or replacement of, the guard system on D–102 would have been performed by SWAI or Shinko America employees, or third parties hired by SWAI or Shinko America. Kataoka explained that while "[i]t is possible Shinko [Japan] translated the manufacturer's manual," it did not write the manual. Kataoka states no Shinko Japan employees recall speaking with Rivera or having a conversation with Rivera wherein he requested guarding for D–102.

Evidence regarding whether D–102 was deactivated in 1994,[7] whether Rivera complained to Shinko Japan about the lack of sufficient guarding on D–102, and whether Shinko Japan performed any repairs to, or was otherwise responsible for the maintenance and safety of D–102 is conflicting. However, the trial court resolved such fact issues in favor of Shinko Japan.[8] Therefore, we conclude Shinko Japan has negated all bases for specific jurisdiction.

## VII. GENERAL JURISDICTION

Appellants also assert Texas courts have general jurisdiction over Shinko Japan because, according to appellants, Shinko Japan has maintained continuous and systematic contacts with Texas.

### A. Alter Ego

 Appellants argue the court has general jurisdiction over Shinko Japan because it was the alter ego of SWAI and Shinko America. Personal jurisdiction may be established over a nonresident defendant if the relationship between the foreign corporation and its subsidiary that does business in Texas would allow the court to impute the subsidiary's "doing business" to the parent corporation. *BMC Software*, 83 S.W.3d at 798. Appellants bear the burden of proving the existence of such a relationship. *Id.; Conner*, 944 S.W.2d at 418.

 "Generally, a foreign parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is present or doing business there; the mere existence of a parent-subsidiary relationship is not sufficient to warrant the assertion of jurisdiction over the foreign parent." *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983); *Dunn v. A/S Em. Z. Svitzer*, 885 F.Supp. 980, 987 (S.D.Tex.1995); *Conner*, 944 S.W.2d at 418. In certain circumstances, however, a close relationship between the parent and its subsidiary may justify a finding that the parent "does business" in a forum through the local activities of its subsidiaries. *Hargrave*, 710 F.2d at 1159; *Conner*, 944 S.W.2d at 418. The rationale for exercising jurisdiction is that "the parent corporation ex-

---

7. Rivera stated that he operated D–102 from 1985 through 1999, without reference to D–102 having been deactivated.

8. Appellants also claim specific jurisdiction exists based on Shinko Japan's allegedly supplying defective spare machine parts to SWAI and Shinko America. However, a review of the Zamarrons' petition reveals that they did not base either their negligence claim or their strict products liability claim on defective spare parts. *See Conner*, 944 S.W.2d at 410 (explaining that specific jurisdiction is established when plaintiff's cause of action arises out of, or relates to, defendant's contacts with forum state).

erts such domination and control over its subsidiary 'that they do not in reality constitute separate and distinct corporate entities but are the same corporation for purposes of jurisdiction.'" *Hargrave,* 710 F.2d at 1159 (quoting 2 J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 4.25[6], at 4–273 (2d ed.1982)); *Dunn,* 885 F.Supp. at 987; *Conner,* 944 S.W.2d at 418.

As long as the parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other. *Hargrave,* 710 F.2d at 1160. One hundred percent stock ownership, commonality of officers and directors, and an exercise of control derived from stock ownership are not sufficient to establish an alter ego relationship. *BMC Software,* 83 S.W.3d at 799. Instead, proof of control by the parent over the internal business operations and affairs of the subsidiary must be shown "in order to fuse the two for jurisdictional purposes." *Hargrave,* 710 F.2d at 1160; *Dunn,* 885 F.Supp. at 987. Thus, while the parent may have complete authority over general policy decisions of the subsidiary, including selection of product lines, hiring and firing of officers, and approval of sizable capital investments, it may not be involved in its subsidiary's day-to-day operations. *Dunn,* 885 F.Supp. at 988 (citing *Hargrave,* 710 F.2d at 1160).

With regard to Shinko Japan's relationship with SWAI and Shinko America, Kataoka states in his affidavit that: (1) Shinko Japan never had any offices in common with SWAI or Shinko America; (2) SWAI and Shinko America maintained their own financial data; (3) SWAI and Shinko America maintained their own bank accounts and accounting functions separate and distinct from Shinko Japan, and reported their profits and losses separate and distinct from Shinko Japan's business activities; (4) there are no known undocumented transfers of funds between Shinko Japan and SWAI or Shinko America; and (5) the daily operations of SWAI and Shinko America were kept separate from Shinko Japan.

Appellants assert that Shinko Japan was "doing business" through the activities of SWAI and Shinko America by maintaining employees at the Houston plant. The record shows that a Shinko Japan "tech person" was assigned to the plant for two years, and its engineers visited the plant up to three times a year to assist with problem solving and troubleshooting. This is not sufficient to establish that Shinko Japan had, or otherwise exerted, control over the daily operations of Shinko America and SWAI. *See Dunn,* 885 F.Supp. at 988 (stating that day-to-day business and operational decisions may not be made by parent). In fact, both Coppinger and Kataoka state that Shinko Japan was not involved in the daily operations of SWAI or Shinko America.

Appellants also argue that Shinko Japan exerted control over SWAI when its board of directors approved the sale of SWAI's assets to American Spring Wire, thereby justifying a finding that Shinko Japan and SWAI are the same corporation for jurisdictional purposes. We conclude that approval of the sale of SWAI's assets to American Spring Wire by Shinko Japan in its role as sole shareholder of SWAI is not sufficient to establish that it is the alter ego of SWAI or Shinko America. *See Hargrave,* 710 F.2d at 1161 (stating degree of control must be more than what is appropriate for sole shareholder of corporation); *BMC Software,* 83 S.W.3d at 799 (explaining that 100% stock ownership, commonality of officers and directors, and exercise of control derived from stock own-

ership are not sufficient to establish alter ego relationship).

The record does not support appellants' assertion that Shinko Japan was the alter ego of SWAI or Shinko America. Therefore, the trial court properly concluded that it does not have general jurisdiction over Shinko Japan based on SWAI or Shinko America's "doing business" in Texas.

### B. Prior Litigation

 Appellants contend that Shinko Japan purposely availed itself of the rights and benefits of Texas law when it previously filed cross-actions in two unrelated lawsuits. Voluntarily filing a lawsuit in a jurisdiction is purposeful availment of the jurisdiction's facilities and can subject a party to personal jurisdiction in another lawsuit only when the lawsuits arise from the same general transaction. *Tuscano v. Osterberg*, 82 S.W.3d 457, 467 (Tex.App.-El Paso 2002, no pet); *Primera Vista S.P.R. de R.L. v. Banca Serfin, S.A. Institucion de Banca Multiple Grupo Financiero Serfin*, 974 S.W.2d 918, 926 (Tex.App.-El Paso 1998, no pet.) (citing *General Contracting & Trading Co. v. Interpole, Inc.*, 940 F.2d 20, 22 (1st Cir.1991)). A review of the record reflects that Shinko Japan filed a cross-action in 1983, subject to a special appearance and a second cross-action in 1981, not subject to a special appearance. A review of these cross-actions does not reflect that those lawsuits were related in any way to this current action and, therefore, do not establish general jurisdiction over Shinko Japan.

### C. Continuous and Systematic Activities

 Appellants further contend general jurisdiction exists based on the sale of SWAI's assets located in Texas to American Spring Wire. In support of this assertion, appellants rely on documents memorializing the sale of SWAI's assets, including the Asset Purchase Agreement, Real Property Purchase Agreement, Deed of Trust, Security Agreement, and Promissory Note. Shinko Japan is (1) identified as a party to the Asset Purchase Agreement with American Spring Wire; (2) a beneficiary of the Deed of Trust; (3) protected as a holder of the Promissory Note under the Security Agreement; and (4) a provider of warranties and indemnities under the Real Estate Purchase Agreement. According to appellants, these documents establish Shinko Japan's right to receive money, obligate Shinko Japan to perform covenants and indemnity agreements in Texas in the future, and further contemplate that Texas law will apply and provide that Texas courts will enforce in the event of the breach of those covenants and indemnity agreements.

A review of these documents reflects that (1) the Asset Purchase Agreement was executed in Ohio and that Ohio law applies; (2) the Promissory Note was executed in Ohio, is subject to the terms and conditions of the Asset Purchase Agreement, to which Ohio law applies, and requires American Spring Wire to make payments on the note in Japan; (3) Shinko Japan was not a party to the Security Agreement, the Deed of Trust, or the Real Property Purchase Agreement, although each of these documents reference Shinko Japan and the Asset Purchase Agreement.

Although Shinko Japan did not own the assets sold to American Spring Wire, it was a 100% shareholder in SWAI and, consequently, Shinko Japan's board approved the sale. However, such approval is consistent with Shinko Japan's role as sole shareholder of SWAI. While American Spring Wire makes payments to Shinko Japan on the purchase of SWAI's assets,

such payments are made in Japan, not Texas. Appellants further maintain that by entering into covenants and indemnities in its own name under which it agreed to protect a business operating in Texas from claims brought by third parties, Shinko Japan subjected itself to the general jurisdiction of Texas courts. Such covenants and indemnification agreements create speculative contact with Texas and cannot be .considered continuous and systematic for purposes of establishing general jurisdiction. *Gessmann v. Stephens,* 51 S.W.3d 329, 340 (Tex.App.-Tyler 2001, no pet.).

Appellants further contend that from 1981 to 1996, Shinko Japan sold parts to SWAI and Shinko America "for millions of dollars," thereby establishing continuous and systematic contacts with Texas. The invoices appellants submitted in support of this alleged basis for general jurisdiction state that the parts are to be shipped "F.O.B. Osaka." Therefore, title to those parts passed from Shinko Japan to SWAI or Shinko America in Japan. *See Polythane Sys., Inc. v. Marina Ventures, Int'l, Ltd.,* 993 F.2d 1201, 1205 n. 6 (5th Cir. 1993). "Title passing outside of Texas is a factor that weighs against a finding that Texas has general jurisdiction over a nonresident defendant such as [Shinko Japan]." *Coleman,* 83 S.W.3d at 808; *see also Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 372–73 (5th Cir.1987) (finding no jurisdiction where $72 million of product was shipped "F.O.B. Wichita [Kansas]").

■ Appellants also assert that Shinko Japan maintains an authorized agent in Texas. On November 15, 2000, Andy Smallwood executed a release of lien on behalf of Shinko Japan on the property where Zamarron's injury occurred. Moreover, when appellants attempted to depose Smallwood, Shinko Japan moved to quash the deposition because Smallwood "was and is Shinko [Japan's] lawyer." The

mere presence of an "authorized agent" or attorney of a foreign corporate defendant in Texas does not establish continuous and systematic activities in Texas. *Cf. Wenche Siemer v. Learjet Acquisition Corp.,* 966 F.2d 179, 183 (5th Cir.1992) (stating that "mere act of registering an agent" does not create "general business presence in Texas"); *Conner,* 944 S.W.2d at 417 (holding compliance with registration statutes confers jurisdiction only if corporation's contacts are continuous and systematic); *Juarez v. United Parcel Serv. De Mexico,* 933 S.W.2d 281, 285 (Tex.App.-Corpus Christi 1996, no writ) (stating that designation of agent for service of process in Texas is not general consent to jurisdiction, but is merely one of many factors to consider in minimum contacts analysis)

Appellants cite other evidence they claim demonstrate Shinko Japan's continuous and systematic activities in Texas: (1) Shinko Japan designed, assisted, and supervised the installation of several of the machines in the Houston plant; and (2) Shinko Japan's employees traveled to Texas several times a year to provide assistance with maintenance and on-site advice, and to inspect, repair, and modify the machines. Shinko Japan's presence at the plant up to three times a year to either assist with specific problems or to give advice does not establish continuous and systematic activities sufficient to confer general jurisdiction.

In his affidavit, Kataoka states Shinko Japan:

● is not a corporation organized or doing business in Texas;

● has not maintained a place of business or other business operations in Texas;

● has not sold, distributed, or licensed any products in Texas, since at least January 1, 1997;

- does not exercise daily control over any entity having contacts with Texas;
- has never established an address or telephone number in Texas;
- has not appointed an agent for service in Texas;
- has never maintained a bank account in Texas;
- has never made a loan application or received a loan in Texas;
- has never owned an interest in real or personal property located in Texas and has never paid income or property taxes on property located in Texas;
- has never contracted to insure any person, property, or risk located in Texas;
- has not hired any employees who are or were domiciled in Texas at the time of employment;
- does not maintain records, goods, or other business supplies in Texas;
- does not conduct board of directors meetings in Texas;
- does not direct any advertising specifically toward Texas;
- does not derive substantial revenue from goods sold or services rendered in Texas.

▉▉▉▉ "[F]or general jurisdictional purposes, we do not view each contact in isolation. All contacts must be carefully investigated, compiled, sorted, and analyzed for proof of a pattern of continuing and systematic activity." *Coleman,* 83 S.W.3d at 809. Thus, we look at the quality of the contacts, not the quantity of contacts. *Id.* at 809–10.

Shinko Japan is not organized to do business in Texas, has no address or telephone number in Texas, does not maintain any bank accounts in Texas, does not own property in Texas, has not paid taxes in Texas, and does not have employees domiciled in Texas. Shinko Japan sent employees to Texas several times a year to assist with problems at the plant. When Shinko Japan sends machine parts to Texas, its does so "F.O.B. Osaka," thereby ensuring that title passes in Japan, not Texas. In short, Shinko Japan has structured its business so as not to maintain any continuous presence in Texas and therefore "has not afforded itself the benefits and protections of the laws of Texas, but instead has calculatedly avoided them." *Bearry,* 818 F.2d at 375–76.

Because the trial court has neither specific nor general jurisdiction over Shinko Japan, it properly granted the special appearance.[9] Accordingly, the judgment of the trial court is affirmed.

▉▉▉▉▉

9. Because we do not find sufficient minimum contacts, we do not reach the fair play and substantial justice analysis.