Reversed and Remanded and Opinion filed November 18, 2004









Reversed and Remanded and Opinion filed November 18,
2004.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-04-00080-CV

____________

 

TEMPEST
BROADCASTING CORPORATION, Appellant

 

V.

 

CHRISTOPHER D.
IMLAY AND BOOTH, FRERET, IMLAY & TEPPER, P.C.,

Appellees

 



 

On Appeal from the 152nd District
Court

Harris County,
Texas

Trial Court Cause No.
03-17593

 



 

O P I N I O N

In this interlocutory appeal, we are asked
to consider whether the trial court erred in granting the special appearance of
an out-of-state lawyer and law firm whose contacts with Texas have been limited
to the performance of legal representation on behalf of their Texas client in
negotiations with a Texas company to purchase a Texas radio station.  For the reasons detailed below, we reverse
and remand. 

 

 








FACTUAL and PROCEDURAL BACKGROUND

1.       A
Texas Seller Begins Negotiations with a Texas Buyer. 

At the center of this dispute is an AM
radio station located in Robstown, Texas, and a Federal Communication
Commission (FCC) broadcasting license. 
Appellant Tempest Broadcasting Corporation (“Tempest”), a Texas
corporation with its principal place of business in Harris County, Texas, once
owned the physical radio station and also held the FCC license.  In 1998, Tempest sold the station and
assigned the license to another Texas entity, The Worship Center of Kingsville
(“WCK”), and provided financing to WCK (while retaining a security
interest).  After a few years, WCK became
delinquent on its payments and Tempest and WCK began to discuss possible
options.

B Communications (“B”), also a Texas
entity, approached Tempest and WCK to discuss purchasing the radio station and
obtaining an assignment of the FCC license. 
To assist in the negotiations, B hired attorney Christopher Imlay and
his firm, Booth, Freret, Imlay & Tepper, P.C. (the “law firm”).  Imlay, president of the law firm and a
resident of Maryland, practices solely in the area of communications law before
the FCC. 

2.       Imlay
and the law firm conduct negotiations with Tempest for the radio station and
broadcasting license.

Imlay first communicated with Tempest’s
owner, David Showalter, on September 14, 2001, by telephone.  At that time, according to Showalter, Imlay
advised that the sale should go through a “two-step” process—the land first and
then the license.  On September 25, 2001,
Imlay forwarded to Showalter two proposed documents, both of which were drafted
by the law firm.  The first was an asset
purchase agreement for the purchase and sale of the station and land in Robstown,
Texas, for $32,000, and the second was a separate license assignment agreement
conveying the FCC license to B for $200,000. 
B, Tempest, and WCK were all listed as parties to these proposed
agreements.








On at least two occasions during the
negotiations in 2001 and 2002, Imlay represented in writing to Showalter that
he would start the FCC application for approval of the license assignment after
the agreements were signed.  Drafts of
the two agreements and proposed revisions were exchanged between Tempest and
Imlay.

3.       Imlay and the law firm negotiated a
separate agreement of the FCC license from WCK to B without informing Tempest.

In October 2000,
apparently unbeknownst to Tempest, B and WCK entered into a separate agreement
in which WCK agreed to assign the FCC license to B for $10,000.  Imlay obtained FCC approval for the
assignment on behalf of B.  The
assignment of the license was consummated on January 4, 2002.  On January 10, 2002, Imlay notified Tempest
by fax that “all of the necessary arrangements for the assignment of the FCC
license from The Worship Center of Kingsville are in place.”  Showalter responded by fax to Imlay the next
day, claiming that Tempest had relied on Imlay’s representations that the
parties’ complete agreement (physical plant AND license) was “a done deal” and
that, in reliance on those representations, Tempest had refrained from taking
action to protect its interest in the property and the license.  Tempest, WCK and B eventually executed an
asset purchase agreement in which B agreed to pay Tempest $225,000 for the land
and physical property of the radio station (not including the license), but the
closing provided for in the agreement never occurred.  The parties dispute the reasons why that
closing never occurred.  

4.       Tempest sues B, Imlay, and the law firm,
and the trial court grants the defendants’ special appearance.

In the spring of
2003, Tempest sued B, Imlay, and the law firm, alleging breach of contract,
tortious interference with contract, fraud, and hindering a secured
creditor.  Tempest’s primary complaint
was that the defendants, without Tempest’s knowledge or permission, obtained
the FCC license—the most valuable asset—for $10,000 while representing to
Tempest that they intended to complete the purchase of the license and the
station property for $232,000.  According
to Tempest, once the defendants possessed the FCC license, they had no need for
the station, which had little value apart from the license.








In response, Imlay
and the law firm filed a special appearance supported by Imlay’s
affidavit.  In the affidavit, Imlay
asserted generally that neither he nor any other attorney in the law firm
practiced law in Texas; neither he nor the law firm owned property, maintained
an office or bank accounts, or paid taxes in Texas; neither he nor anyone in
the law firm ever traveled to Texas to meet with any party to this litigation;
and neither he nor the law firm has ever purposefully directed any action
toward residents or businesses in Texas. 
A day before the hearing on the special appearance, Tempest amended its
petition to add allegations of conspiracy to defraud against all defendants and
additional facts to support personal jurisdiction over Imlay and the law
firm.  At a hearing on the special
appearance, Showalter testified regarding his communications with Imlay and the
law firm and submitted supporting exhibits.

On motion by Imlay
and the law firm, the trial court permitted them to submit a reply post
hearing, and when they did so, they included an additional affidavit by Imlay
in which he responded more specifically to the misrepresentations and other
conduct alleged by Tempest.  The trial
court delayed its ruling until after Imlay’s second affidavit was filed
post-hearing, but then granted the special appearance and dismissed Tempest’s
claims against Imlay and the law firm. 
Although Tempest requested findings of fact and conclusions of law and
renewed its request in a notice of past due findings of fact and conclusions of
law, the trial court was not required to and did not file them.  This interlocutory appeal followed.

ANALYSIS

I.        The Procedural Arguments








Before we reach
the substantive arguments, we must address two of Tempest’s arguments
concerning the standard and scope of our review.  First, Tempest argues that we should apply a
less deferential standard of review to implied findings of fact, because the
trial court failed to issue findings of fact and conclusions of law after
Tempest properly requested them.  Tempest
believes this would encourage trial courts to comply with proper requests in
interlocutory appeals.  Second, Tempest
contends that our review of the evidence should not include Imlay’s second
affidavit, which was attached to appellees’ reply in support of their special
appearance and filed post-hearing, because Texas Rule of Civil Procedure 120a
requires that affidavits shall be served at least seven days before the hearing
on the special appearance.  We disagree with
Tempest’s first argument and agree with the second. Accordingly, we hold that
the trial court erred in granting appellees’ special appearance.

A.      Is Tempest Entitled to a Lowered Standard
of Review Because the Trial Court Did Not File Findings of Fact and Conclusions
of Law?

Tempest argues
that, instead of applying a legal and factual sufficiency review to the implied
fact findings, we should review them de novo. 
Tempest’s theory is that, because the trial court did not file findings
of fact and conclusions of law, after being properly requested, we should apply
a less deferential standard of review to the trial court’s implied fact
findings.  We disagree.

In reviewing a
trial court’s ruling on a special appearance, the plaintiff has the initial
burden of pleading allegations sufficient to bring the nonresident defendant
within the provisions of the Texas long-arm statute.  BMC Software Belgium, N.V. v. Marchand,
83 S.W.3d 789, 793 (Tex. 2002); Ring Power Sys. v. Int’l De Comercio Y
Consultoria, S.A., 39 S.W.3d 350, 352 (Tex. App.—Houston [14th
Dist.] 2001, no pet.).  At the special
appearance hearing, however, the nonresident challenging the court’s assertion
of personal jurisdiction must negate all jurisdictional bases.  BMC Software, 83 S.W.3d at 793; Ring
Power Sys., 39 S.W.3d at 352.








Whether a court
has personal jurisdiction over a defendant is a question of law, which we
review de novo.  BMC Software, 83
S.W.3d at 794.  However, the trial court
is often called upon to resolve factual issues before deciding the jurisdiction
question.  Id.; C‑Loc
Retention Sys., Inc. v. Hendrix, 993 S.W.2d 473, 476 (Tex. App.—Houston
[14th Dist.] 1999, no pet.).  When, as
here, the trial court does not issue findings of fact and conclusions of law with
its special appearance ruling, all facts necessary to support the judgment and
supported by the evidence are implied.  BMC
Software, 83 S.W.3d at 795.  In that
situation, when the appellate record includes both the reporter’s and clerk’s
records, however, these implied findings are not conclusive and may be
challenged for legal and factual sufficiency. 
Id.  In reviewing a legal
sufficiency challenge, the no-evidence challenge fails if there is more than a
scintilla of evidence to support the finding. 
Id.  In reviewing a factual
sufficiency challenge, we set aside the trial court’s decision only if its
ruling is so contrary to the overwhelming weight of the evidence as to be
clearly wrong and manifestly unjust.  In
re King’s Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

Tempest
acknowledges that Texas Rule of Appellate Procedure 28.1 expressly provides
that the trial court “need not, but may . . . file findings of fact and
conclusions of law” relating to an appealable interlocutory order.  See Tex.
R. App. P. 28.1.  Nevertheless, it
argues that when a party properly requests findings of fact and conclusions of
law and preserves the issue for appeal, it should not be subjected to a
“harsher” standard of review because the trial court declines to file them.  Tempest argues that the standard of review
for implied findings should be de novo because, by applying this less
deferential standard of review, trial courts will be encouraged to issue
findings of fact and conclusions of law when properly requested.  Otherwise, they will have no incentive to ever
file them in an interlocutory appeal.  








Tempest’s argument
fails to encompass the concept that a trial court might voluntarily file
findings and conclusions to assist the appellate courts, an occurrence neither
unique nor unusual.  Indeed, this
argument smacks of the notion that trial judges need an incentive to
voluntarily clarify their legal reasoning. 
Typically the record makes the judge’s thoughts crystal clear, as was
the case here.  Tempest’s argument also
ignores Rule 28.1, which states that a trial court may—but is not required
to—file findings of fact and conclusions of law.  See Smith Barney Shearson, Inc. v. Finstad,
888 S.W.2d 111, 114 (Tex. App.—Houston [1st 
Dist.] 1994, no writ).  Moreover,
Tempest does not explain why reviewing implied fact findings under a legal and
factual sufficiency review is unduly harsh, and it does not provide us any
authorities that support applying a de novo review of implied fact findings in
this circumstance.[1]  Therefore, we are not persuaded that we
should encourage trial courts to do something that, under the rules, they are
expressly not required to do.

Accordingly, we
will review any implied findings of fact for legal and factual sufficiency. See
BMC Software, 83 S.W.3d at 795; In re King’s Estate, 244 S.W.2d at
661.

B.      Should We Consider Imlay’s Second
Affidavit Attached in Support of Appellees’ Reply, When the Affidavit Was Not
Served at Least Seven Days Before the Special Appearance Hearing as Required in
Rule 120a?

Tempest also
raises an issue concerning the scope of our review.  At the special appearance hearing, Tempest
presented testimony from Showalter and introduced a number of exhibits in
support of jurisdiction.  Imlay and the
law firm presented no additional evidence, instead relying on Imlay’s
previously-filed affidavit.  Toward the
end of the hearing, the following exchange took place as Tempest’s counsel, Ms.
Willi, made her final argument:

Ms. Willi:               . . . We have specific jurisdiction under all of the
facts that we have stated today and as well as in the discovery responses, we
have grounds to support even general jurisdiction because he has regular
contacts with Texas.  He represents – he
states in his interrogatories that he represents entities all over Texas in
their endeavors to buy radio stations located here in Texas and he has
represented particularly the B Communications clients since at least 1993 on
many Texas transactions.








Ms. LeBlanc:          Your Honor, just one caveat to that.  If I could reply to that, Your Honor, is that
Mr. Imlay has never actually met B Communications here in Texas.  He was retained while attending a seminar in
Oklahoma pertaining to the FCC.  So, he’s
never met with anyone on this transaction here in Texas.

The Court:             Give me a reply as soon as you can.

Ms. LeBlanc:          Yes, Your Honor.

Thereafter, Imlay
and the law firm filed a reply, but they attached to the reply a second, more
detailed affidavit by Imlay.  In the
second affidavit, which is three pages long and contains seventeen substantive
paragraphs, Imlay sets out numerous factual allegations (none of which were
raised at the hearing) to support his position that jurisdiction should not
attach. 

Tempest filed
objections to the second affidavit, arguing that, among other things, it was
untimely because, under Texas Rule of Civil Procedure 120a(3), any affidavits
“shall be served at least seven days before the hearing” on the special
appearance.  See Tex. R. Civ. P. 120a(3).  Appellees assert that their late-filed
response was acceptable because it is within the trial judge’s discretion to
allow movants an opportunity to reply, and the trial court’s request for a
reply from the movants implicitly permitted the late filing of the
affidavit.  Appellees reason that, since
Tempest did not file its response to the special appearance and its first
amended petition containing the additional jurisdictional allegations until the
day before the hearing, they should be allowed to file their controverting
proof after the hearing.  Appellees
conclude with the argument that Tempest waived its objection to the later-filed
affidavit because it failed to secure a ruling as required by Texas Rule of
Appellate Procedure 33.1.[2]








The language of
Rule 120a is specific that any affidavits “shall be served at least seven days
before the hearing.”  See Tex. R. Civ. P. 120a(3).  Imlay and the law firm did not file their
second affidavit until after the hearing. 
The rule provides that, when it appears from the affidavits of a party opposing
the special appearance that he is unable to present by “facts essential to
justify his opposition,” the trial judge may “order a continuance to permit
affidavits to be obtained or depositions to be taken or discovery to be had or may
make such other order as is just.”  See
id. (emphasis added); see also Potkovick v. Reg’l Ventures, Inc.,
904 S.W.2d 846, 850 (Tex. App.—Eastland 1995, no writ) (holding that trial
court does have some discretion under Rule 120a to enter other orders as are
“just”).  This part of the rule appears
to permit the judge some discretion to order a continuance or other relief, but
only in response to the affidavit of a party opposing the special appearance
who claims he cannot adequately prepare for the special appearance
hearing.  Here, because appellees are the
movants in the special appearance motion (as opposed to being the opposing
party), this part of the rule does not apply to them.  Additionally, since appellees did not
demonstrate by affidavit that they needed a continuance of the hearing to
“present facts essential to justify [their] opposition,” we find no basis in
the rule to support the contention that the late-filed affidavit must be
considered by the trial judge. 

Now we must
consider appellees’ contention that Tempest waived its objection to Imlay’s
second affidavit because it did not obtain a ruling from the trial court.  See Tex.
R. App. P. 33.1(a).  The record
does not support the argument that the court intended to permit appellees carte
blanche rights to provide additional evidence (via affidavit).  Since the late-filed affidavit was not
properly before the trial court pursuant to 120a, it makes no sense to penalize
Tempest for failing to obtain a ruling from the trial court on its objection to
the very filing of which it complains. 
Had appellees requested leave of court to re-open the evidence in a
subsequent hearing to add the tardy affidavit, Tempest at least would have been
given the right to present controverting evidence and cross-examine.  As it is, appellees have gotten in the last
word while Tempest was silenced by section 120a.








Nor are we
persuaded by appellees’ argument that they did not know of Tempest’s specific
allegations until shortly before the hearing. 
Imlay and the law firm were the movants and had the burden to
demonstrate they were not amenable to jurisdiction in Texas.  They were also aware of the basis for
Tempest’s claims, which was apparent from its original petition.  Permitting movants to submit post-hearing
affidavits in such a situation encourages them to withhold evidence until after
the hearing, potentially providing an unfair advantage to the movant and
extending the entire process in a manner not contemplated by Rule 120a. 

Therefore, we hold
that Imlay’s second affidavit was not properly before the trial court and
should not be considered.

II.       The Long-arm Statute and Federal Due
Process Requirements

We turn now to the
substance of the appeal.  Tempest
contends that Imlay and the law firm satisfy the requirements of the Texas
long-arm statute because they conducted business in Texas and committed torts
in Texas.  Tempest also argues that
subjecting Imlay and the law firm to the jurisdiction of Texas courts would not
violate the federal due process clause. 

Texas courts may
exercise jurisdiction over a nonresident defendant when (1) the Texas long‑arm
statute authorizes the exercise of jurisdiction, and (2) the exercise of
jurisdiction is consistent with federal and state constitutional guarantees of
due process.  See Tex. Civ. Prac. & Rem. Code §§
17.041–.069; Am. Type Culture Collection, Inc. v. Coleman, 83 S.W.3d
801, 807 (Tex. 2002).  The Texas long‑arm
statute authorizes the exercise of jurisdiction over a nonresident who does
business in Texas.  Tex. Civ. Prac. & Rem. Code §
17.042.  A nonresident “does business” in
Texas for the purposes of the Texas long‑arm statute if he “commits a
tort in whole or in part in this state.” Id.; see also Arterbury v.
Am. Bank & Trust Co., 553 S.W.2d 943, 946 (Tex. Civ. App.—Texarkana
1977, no writ).  Because the language of
the long‑arm statute is broad, its requirements are met so long as the
exercise of personal jurisdiction comports with the limitations of federal due
process.  Coleman, 83 S.W.3d at
806 (citing Guardian Royal Exch. Assurance, Ltd. v. English China Clays,
P.L.C., 815 S.W.2d 223, 226 (Tex. 1991)). 








Personal
jurisdiction over nonresident defendants satisfies the requirements of federal
due process when two conditions are met: (1) the defendant has established
minimum contacts with the forum state, and (2) the exercise of jurisdiction
comports with traditional notions of fair play and substantial justice.  BMC Software, 83 S.W.3d at 795 (citing
Int’l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).  A nonresident defendant that has purposefully
availed itself of the privileges and benefits of conducting business in the
foreign jurisdiction has sufficient contacts with the forum to confer personal
jurisdiction.  Id. (citing Burger
King Corp. v. Rudzewicz, 471 U.S. 462, 474–76 (1985)).  A nonresident defendant should not be subject
to a foreign court’s jurisdiction based on “random,” “fortuitous,” or
“attenuated” contacts.  Id.  When minimum contacts have been demonstrated,
the defendant must present a “compelling case” that the existence of other
factors would render jurisdiction unreasonable.  Guardian Royal, 815 S.W.2d at 231. 

We first examine
Tempest’s contention that appellees satisfied the requirements for the exercise
of jurisdiction under the Texas long-arm statute.  We then address whether the exercise of
jurisdiction over appellees comports with the limitations imposed by federal
due process on the exercise of jurisdiction.

A.      “A Purposeful Act”—Was Jurisdiction
Invoked Under the Long-arm Statute Because Imlay and the Law Firm Committed
Torts in Texas?








Among other
things, Tempest contends that Imlay and the law firm committed torts in Texas
that bring them within the reach of the Texas long-arm statute.  Imlay and the law firm disagree because they
believe they proved that Imlay did not make any misrepresentations and he did
not tortiously interfere with any contract.[3]  When reaching a decision to exercise or
decline jurisdiction based on the defendant’s alleged commission of a tort, the
trial court should rely only upon the necessary jurisdictional facts and should
not reach the merits of the case.  See
Ring Power Sys. v. Int’l De Comercio & Consultoria, S.A., 39 S.W.3d 350,
353 (Tex. App.—Houston [14th Dist.] 2001, no pet.).  The purpose of a special appearance is not to
determine liability, but whether the actions alleged by a plaintiff are of a
type that suggest a defendant should expect to be subject to Texas jurisdiction.  Mort Keshin & Co., Inc. v. Houston
Chronicle Publ’g Co., 992 S.W.2d 642, 648 (Tex. App.—Houston [14th Dist.]
1999, no pet.).  “Accordingly, where the
plaintiff alleges an action in tort that arose out of an act committed in
Texas, the necessary proof is only that the purposeful act was committed in
this State.”  Ring Power, 39
S.W.3d at 353.  

In its pleadings,
Tempest alleges that Imlay and the law firm committed the torts of fraud,
conspiracy to defraud, and tortious interference with contract, and that this
conduct caused Tempest to suffer damages. 
In the fraud and conspiracy to defraud causes of action, Tempest alleges
that appellees and B represented that it was necessary to structure the
transaction for the purchase of the radio station and the FCC license
separately to avoid the violation of any FCC laws.  They also made various statements and
representations to Tempest that they were working to conclude the entire
transaction and preparing to close on the agreement.  In fact, Tempest alleges, appellees and B
were actually seeking to obtain the FCC license for less than it was worth
without Tempest’s knowledge, and they never intended to conclude the
transaction.  In its tortious
interference claim, Tempest alleges that appellees and B were aware of WCK’s
obligations to Tempest, but nevertheless induced it to ignore and violate those
obligations in order to obtain the transfer of the FCC license at an
egregiously discounted price.  In a
separate section, Tempest alleges additional facts supporting jurisdiction,
including at least ten specific communications with Imlay in Texas regarding
the negotiations for the radio station and the license.  








At the special
appearance hearing, Tempest presented testimony from Showalter in support of
the specific allegations made in its first amended petition.  Showalter testified that Imlay made specific
representations over the telephone and in writing to him in Texas regarding the
necessity of structuring the transaction to document the assignment of the FCC
license separately from the sale of the radio station property and other assets,
and regarding the progress of the negotiations. 
Showalter stated that he relied on those representations.  Tempest submitted evidence of written
communications from Imlay on law firm letterhead and proposed draft agreements
sent to Tempest in Texas, as well as written communications and drafts from
Tempest to Imlay at the law firm. 
Showalter also testified that there were “multiple other letters and
phone calls” between him and Imlay.  

Appellees contend,
however, that they negated all bases of jurisdiction alleged by Tempest by
demonstrating that they did not commit any torts in Texas.  See French v. Glorioso, 94 S.W.3d 739,
746–47 (Tex. App.—San Antonio 2002, no pet.) (noting that “where jurisdiction
rests upon the fact the defendant committed a tortious act, the specially
appearing defendant can defeat the exercise of jurisdiction by proving that he
did not do the act alleged”).  We
disagree.

First, appellees
rely heavily on Imlay’s second, more detailed affidavit, submitted with their
post-hearing reply, in which he denies making misrepresentations to
Tempest.  As we have already determined,
however, Imlay’s second affidavit was not properly before the trial court
because it was not timely filed. Without this affidavit, many, if not all, of
Tempest’s jurisdictional facts as well as Tempest’s allegations of
misrepresentations by Imlay are undisputed.








Even if we were to
consider Imlay’s second affidavit, however, our conclusion that appellees
failed to negate all jurisdictional bases would not change.  Although Imlay denied making certain oral
representations to Showalter during the negotiations, he did not dispute the
contents of any of his written communications to Tempest, nor did he dispute
that he made the communications.  These
communications support Tempest’s allegations and the communications were
properly before the trial court as evidence. 
For example, the evidence shows that, on October 24, 2001, Imlay
forwarded two draft asset purchase agreements to Showalter and Gerald Benavides
of B, one for the FCC license assignment and one for the radio station property
and other assets.  Both drafts included
Tempest, B, and WCK as parties, and reflected that Tempest held a security
interest in some of the station’s assets. 
Yet, at around the same time (and unbeknownst to Showalter), on October
26, 2001, B and WCK executed the license assignment agreement that did not
include Tempest as a party.[4]  Although Imlay asserts in his second
affidavit that there was nothing surreptitious about the assignment, he
provides no explanation as to why he was drafting documents on one hand that
included Tempest as a participant in both aspects of the transaction, while on
the other hand, he was simultaneously drafting a separate assignment from WCK
for his client.  

Appellees also
rely on an October 19, 2001 letter that Imlay wrote to Showalter in which he
informed Showalter that B was going to acquire the FCC license and files
directly from WCK.  However, other
letters from Imlay, both before and after the October 19 letter,[5]
show that Imlay represented that he would not proceed with the FCC application
for approval of the license assignment until after the parties signed the
agreements.  It is undisputed that,
despite his representations, Imlay proceeded with obtaining FCC approval before
B reached an agreement with Tempest. 
And, in another letter Imlay wrote to Tempest on January 10, 2002, Imlay
stated that “all the necessary arrangements for the assignment of the FCC
license from The Worship Center of Kingsville are now in place,” implying that
the assignment was set to occur sometime in the future.  But, by that time, the FCC had already
approved the application for the license assignment from WCK to B and the
assignment had been consummated. 
Although appellees contend the statement is not misleading, we note that
Imlay offers no explanation in his second affidavit for the inherent
discrepancy in the statement.








Therefore, even if
we were to consider Imlay’s second affidavit, Tempest’s jurisdictional facts
based on representations about the structure and progress of the transaction—made
to Tempest in Texas and relied upon by Tempest to its detriment—are supported
by the documentary evidence and are not negated.  These jurisdictional facts are sufficient to
support the exercise of long-arm jurisdiction. 
See Ring Power, 39 S.W.3d at 353–54 (noting that alleged
misrepresentation committed partially in Texas satisfied requirement for
jurisdiction under long‑arm statute); Mem’l Hosp. Sys. v. Fisher Ins.
Agency, Inc., 835 S.W.2d 645, 650 (Tex. App.—Houston [14th Dist.] 1992, no
writ) (holding misrepresentation made by out‑of‑state defendant to
Texas plaintiff who relied on it in Texas satisfied requirement for
jurisdiction under long-arm statute based on commission of a tort in part in
Texas).  

Next, appellees
contend that Tempest was on constructive notice of the filing of the
application seeking FCC approval for the license assignment, because it placed
the application on public notice on November 13, 2001, and the FCC placed the
grant on public notice on December 27, 2001. 
And, appellees assert, Tempest could have filed a petition to deny the
assignment between those dates.  However,
the only evidence in the record to support any of these statements is Imlay’s
statement in his second affidavit that “the FCC application filed was placed on
public notice for thirty days before the FCC granted the application.”  Appellees provide no legal authority to
support their argument that the filing put Tempest on constructive notice, and
do not explain how constructive notice affects Tempest’s jurisdictional
allegations.  In any event, this
“constructive notice” argument does not negate Imlay’s representations to
Tempest that he would file the application for FCC approval of the assignment
of the license only after the parties had executed the agreements. 

Appellees also
attempt to dispute other allegations Tempest makes in its pleadings.  For example, appellees dispute Tempest’s
allegation that the price paid for the assignment of the FCC license was
egregiously discounted.  In their brief,
Imlay and the law firm contend that the price B paid for the license was “quite
reasonable” and that the value of the radio station was less than Tempest
alleged.  However, appellees fail to
highlight evidence in the record to support these contentions, and we have
found none. 








Appellees also
argue that Tempest breached the agreements first by failing to provide certain
documentation and instituting foreclosure proceedings.  However, this is a legal argument in defense
of Tempest’s breach of contract action against B, and it does not affect
Tempest’s jurisdictional argument.

Finally, appellees
argue that they could not have tortiously interfered in the contract between
Tempest and WCK because the FCC prohibits the retention of a security interest
in a broadcasting license.  However, this
is a legal argument that goes to the merits of Tempest’s liability claims, and
we need not reach it here.  See Ring
Power, 39 S.W.3d at 353; Mort Keshin & Co., 992 S.W.2d at
648.  

We find that,
based on this record, appellees did not meet their burden to negate all
jurisdictional facts alleged.  Therefore,
appellees failed to demonstrate that they do not satisfy the requirements for
the exercise of jurisdiction under the long-arm statute based on their
commission of torts in Texas.  

B.      Federal Due Process is Satisfied

1.       Minimum contacts

Tempest argues
that Imlay’s and the law firm’s contacts demonstrate a substantial connection
with Texas that cannot be characterized as random, fortuitous, or
attenuated.  Imlay and the law firm
respond that their activities in representing B in the negotiations were merely
incidental to Imlay’s practice as communications counsel before the FCC, and
therefore cannot subject them to personal jurisdiction in Texas.  

Minimum contacts
requires a substantial connection between the nonresident defendant and
Texas.  See Guardian Royal, 815
S.W.2d at 226.  The substantial
connection must derive from the action or conduct of the nonresident,
purposefully directed toward Texas.  Id.  A nonresident defendant’s minimum contacts
with Texas may confer either specific or general personal jurisdiction.  BMC Software, 83 S.W.3d at 795.  Our analysis in this case focuses on specific
jurisdiction.  








Specific
jurisdiction is established if the defendant’s alleged liability arises from or
is related to an activity conducted within the forum.  Id. at 796.  Accordingly, we focus on the defendant’s
activities and expectations in deciding whether it is proper to call it before
a Texas court.  Coleman, 83 S.W.3d
at 806.  The minimum‑contacts
analysis requires that a nonresident defendant “purposefully avail” itself of
the privilege of conducting activities within Texas, thus invoking the benefits
and protections of the laws of Texas.  Id.  The defendant’s activities, whether they
consist of direct acts within Texas or conduct outside Texas, must justify a
conclusion that they reasonably could anticipate being called into a Texas
court.  Coleman, 83 S.W.3d at 806
(citing World‑Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297
(1980)).  It is not the quantity but the
quality and nature of the contacts that are important to the minimum‑contacts
analysis.  See id.  Even a single act can support jurisdiction so
long as it is substantial.  See
Cartlidge v. Hernandez, 9 S.W.3d 341, 348 (Tex. App.—Houston [14th Dist.]
1999, no pet.); Mem’l Hosp. Sys., 835 S.W.2d at 650–51.

Appellees argue
that they should not be subjected to personal jurisdiction merely because Imlay
was performing services on behalf of his local client.  In support of this contention, they cite Star
Technology, Inc. v. Tultex Corp., 844 F. Supp. 295 (N.D. Tex. 1993).  In that case, the court found jurisdiction
lacking over the nonresident defendant attorney who had traveled to Texas twice
in connection with the representation of his client and filed pleadings in the
lawsuit in Dallas.  Id. at
298.  The court held that these contacts
were insufficient to confer specific personal jurisdiction, noting that, other
than these contacts, the attorney’s former representation appeared to have
occurred in Washington, D.C., with the remainder handled by local counsel.  Id.








However, Star
Technology is easily distinguishable. 
Appellees suggest that Imlay did not actually engage in the negotiations
with Tempest, only that he was the conduit for information or instructions from
B.  Contrary to this suggestion, the
record demonstrates that Imlay, as B’s counsel, participated in several months
of negotiations with a Texas resident for a Texas radio station and its FCC
license, and participated in drafting agreements affecting Texas real property
and assets in Texas.  These contacts were
not merely random, fortuitous or attenuated. 
See BMC Software, 83 S.W.3d at 795.  Appellees chose to undertake the
representation of B in this matter, knowing that their client was located in
Texas and that it was interested in acquiring a Texas radio station and FCC
licence from a Texas resident.[6]  Appellees now seek to avoid the consequences
of that choice.  

More importantly,
however, in Star Technology, the plaintiff alleged no specific acts by
the attorney in Texas to support its allegation of conspiracy.  Id. at 299–300.  Here, Tempest alleged that Imlay made
representations in Texas upon which it relied to its detriment.  These allegations form the basis of Tempest’s
claims against Imlay and the law firm. 
The evidence in support of these allegations shows that appellees should
have known that Imlay’s representations, provided in writing and by telephone,
would be relied upon by Tempest.  See
Ring Power, 39 S.W.3d at 354; Mem’l Hosp. Sys., 835 S.W.2d at
650–51.  The evidence is also sufficient
to support a conclusion that appellees purposefully availed themselves of the
benefits and protections of Texas laws when they transmitted Imlay’s
representations to Tempest in Texas.  See Ring Power, 39 S.W.3d at 354; Mem’l
Hosp. Sys., 835 S.W.2d at 651. 

Therefore, we hold
that appellees did not meet their burden of negating specific jurisdiction as a
basis for the trial court’s exercise of jurisdiction.

2.       Fair play and substantial justice








Having determined
that appellees had sufficient minimum contacts with Texas, we must now decide
whether asserting jurisdiction comports with “traditional notions of fair play
and substantial justice.”  See
Guardian Royal, 815 S.W.2d at 228. 
In analyzing this issue, we consider the following factors:  (1) the burden on the defendant; (2) the
interests of the forum state in adjudicating the dispute; (3) the plaintiff’s
interest in obtaining convenient and effective relief; (4) the interstate
judicial system’s interest in obtaining the most efficient resolution of
controversies; and (5) the shared interest of the several states in furthering
fundamental substantive social policies. 
Id. at 231.  Only in rare
cases will the exercise of jurisdiction not meet this test when the nonresident
defendant has purposefully established minimum contacts with the forum
state.  Id. 

Appellees argue
that the exercise of jurisdiction over them would conflict with our decision in
D.H. Blair Investment Banking Corp. v. Reardon, 97 S.W.3d 269, 275 (Tex.
App.—Houston [14th Dist.] 2002, pet. dism’d w.o.j.), because in that case we
held that D.H. Blair’s mere knowledge that its actions would have effects in
Texas did not equate to purposefully availing itself of the privileges and
benefits of conducting business in that state. 
However, in that case, it was uncontested that none of D.H. Blair’s
alleged activities occurred in Texas, and the implied finding that it had such
knowledge was the only basis for asserting jurisdiction.  Id. at 274–75.  As discussed above, appellees made direct
representations to Tempest in Texas and participated in negotiations with Texas
residents regarding the sale of the Texas radio station and FCC license.  Therefore, the holding in D.H. Blair
is not applicable here.  We also note
that, because specific jurisdiction was not found, the D.H. Blair court
did not even discuss the fair play and substantial justice requirement.  Appellees make no other argument to support
their contention that exercising jurisdiction over them would offend
traditional notions of fair play and substantial justice.








Applying the fair
play and substantial justice factors to this case, we find that exercising
jurisdiction over appellees is not unreasonable.  First, appellees have presented no evidence
that defending themselves in Texas would impose a burden on them.  The mere fact that they are not physically
located in Texas is not persuasive.  See
Ring Power, 39 S.W.3d at 354–55 (noting that “distance alone is not
ordinarily sufficient to defeat jurisdiction”). 
Second, Texas has a significant interest in adjudicating issues
involving Texas entities and Texas property. 
Regarding the third and fourth factors, it is in both Tempest’s and
Texas’s interest to obtain relief against appellees and B in a single action in
Texas.  Finally, the exercise of jurisdiction
over appellees furthers the social policy of the states in protecting their
residents from economic loss resulting from torts.   See Guardian Royal, 815 S.W.2d at
228. 

Accordingly, we
hold that the exercise of specific personal jurisdiction over appellees
comports with traditional notions of fair play and substantial justice.

CONCLUSION

For the foregoing
reasons, we hold that the trial court erred in granting Imlay and the law
firm’s special appearance.  We reverse
the trial court’s order and remand this matter to the trial court for further
proceedings. 

 

 

 

/s/      Elizabeth Ray

Judge

 

Judgment rendered
and Opinion filed November 18, 2004.

Panel consists of
Justice Edelman, Justice Guzman, and Judge Ray.[7]











[1] 
In support of its argument, Tempest cites two cases, but neither case
supports applying a de novo standard of review to fact findings, implied or
otherwise, in a special appearance.  In Zamarron
v. Shinko Wire Co., Ltd, this court merely determined that any complaint
the appellant had about the trial court’s failure to file findings of fact and
conclusions of law after it granted a special appearance was waived because the
appellant failed to file a notice of past due findings of fact and conclusions
of law.  See 125 S.W.3d 132, 137
n.3 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).  The Zamarron court gave no indication
of the nature of the appellant’s complaint and did not discuss applying an
alternative standard of review.  See
id.  Tempest also cites Gen.
Electric. Co. v. Brown & Ross International Distributors, Inc., for the
proposition that the appellate court reviews all the evidence properly
presented to the trial court in a special appearance.  See 804 S.W.2d 527, 534 (Tex. App.—Houston
[1st Dist.] 1990, writ denied).  We do
not disagree with that statement. 
However, in that case, the defendants, whose special appearance was
reversed and remanded, argued in a motion for rehearing that the court of
appeals erroneously applied a de novo standard of review to the
evidence, and in response, the court simply stated that, in a special
appearance, it was appropriate to review all the evidence in the record.  See id. 





[2] 
This argument was made for the first time at the oral argument of this
case.





[3] 
Tempest also alleged that appellees satisfied the “doing business”
requirement of the long-arm statute by representing Texas residents in
negotiations with other Texas residents affecting the sale of real estate in
Texas, participating in the negotiations, and drafting instruments that would
affect the sale of real property in Texas. 
Imlay and the law firm respond that they did not “do business” in Texas
because Imlay was acting only as communications counsel, he does not represent
B or other clients in Texas, his communication with his Texas clients is only
incidental to his practice before the FCC, and he does not draft or negotiate
documents affecting real property in Texas. 
Because we have determined that Tempest’s allegations and evidence
support the exercise of long-arm jurisdiction based on the commission of a
tort, we need not examine these other allegations.





[4] 
Although Imlay states in his second affidavit that Showalter “was made
aware of the assignment,” he does not state when or how this took place.  Showalter testified he first became aware of
the license assignment agreement between B and WCK during discovery in this
lawsuit.  Showalter also testified that
he did not learn of the FCC consent to the assignment until some time after the
consent was granted.





[5] 
One letter was a fax transmittal form, dated September 25, 2001, in
which Imlay stated, “I am prepared to start the FCC application as soon as you
all get these documents executed.”  In
another letter, dated October 24, 2001, Imlay wrote, “Once these agreements are
executed by all parties we will electronically file the assignment application
with the FCC and will copy all parties with it” and stated that other
formalities “should not preclude the filing of the FCC application once these
agreements are signed.”





[6] 
In connection with their argument that Imlay was retained exclusively as
communications counsel and did not draft or negotiate documents affecting real
property in Texas, appellees point out that B had retained local counsel to
handle the actual conveyance of property in Texas.  However, the record reflects very little
evidence, if any, of local counsel’s participation in the negotiations after
Imlay and the law firm became involved.





[7]  The Honorable Elizabeth Ray, Judge
of the 165th District Court of Harris County, sitting by assignment pursuant to
Tex. Gov’t Code § 74.003(h).