Opinion issued October 5, 2006
















In The
Court of Appeals
For The
First District of Texas




NO. 01-06-00414-CV




PCC STEROM, S.A., Appellant

V.

YUMA EXPLORATION AND PRODUCTION COMPANY, INC., IN ITS
INDIVIDUAL CAPACITY AND ON BEHALF OF PALACE
EXPLORATION COMPANY, LIBERTY ENERGY CORPORATION, AND
BONRAY, INC., AND UNITED WELLHEAD SERVICES, INC. A/K/A T–3
UNITED WELLHEAD SERVICES, INC., Appellees




On Appeal from the 61st District Court 
Harris County, Texas
Trial Court Cause No. 2003–33523




MEMORANDUM OPINION In this products liability case, appellant, PCC Sterom, S.A. (“Sterom”),
challenges the trial court’s denial of its special appearance.


 Raising three issues,
Sterom contends that it is not amenable to service in Texas because it did not have
sufficient minimum contacts with Texas to satisfy the requirements of due process. 
          We reverse and render.
Factual Background
          Sterom, a Romanian corporation, manufactures gate valves. Sterom’s principal
place of business and manufacturing facility are located in Campina, Romania. In
October of 2001, Sterom sold a batch of 137 gate valves to appellee, Certified
Equipment, Inc., d/b/a ValveWorks USA (“ValveWorks”), a Louisiana corporation. 
Sterom shipped the valves to ValveWorks at its principal place of business in
Shreveport, Louisiana. In December of 2001, ValveWorks sold one of the valves to
appellee, United Wellhead Services, Inc. a/k/a T–3 United Wellhead Services, Inc.
(“United”). ValveWorks shipped the valve to United’s facility in Robstown, Texas. 
United used the Sterom valve to construct a wellhead assembly for appellee, Yuma
Exploration and Production Company, Inc. (“Yuma”).


 United installed the assembly
on Yuma’s gas well located in St. Bernard Parish, Louisiana. 
Procedural History
          Yuma filed suit against United, alleging that, on July 24, 2002, a leak was 
discovered on the wellhead assembly. Yuma claimed that the wellhead was faulty or
had been improperly installed. Yuma alleged that the leakage caused significant
damage to the well, including a partial loss of the gas reserves. United filed a third-party action against ValveWorks and Sterom, contending that a faulty valve
manufactured by Sterom and distributed by ValveWorks had caused the leakage. 
ValveWorks in turn filed suit against Sterom seeking contractual and statutory
indemnity. ValveWorks non-suited its claims after Sterom agreed to defend and
indemnify it. 
          Yuma amended its petition to include claims against Sterom and ValveWorks
for negligence and breach of warranty. Yuma alleged that Sterom and ValveWorks
were “negligent in the design, manufacture, selection of components, assembly,
distribution, marketing and/or testing of the valve.” 
          Sterom filed a special appearance, and two “amendments” to its special
appearance, challenging the trial court’s in personam jurisdiction over it for the entire
proceeding. Sterom contended that it lacked the requisite minimum contacts with
Texas to satisfy the requirements of due process and that the trial court’s exercise of
personal jurisdiction over it would violate the traditional notions of fair play and
substantial justice. Yuma and United each filed responses. Following a hearing, the
trial court denied Sterom’s special appearance. This interlocutory appeal followed.
Yuma’s Contentions Regarding Verification and Affidavit
          Before we address the merits of Sterom’s challenge to the trial court’s denial
of its special appearance, we consider Yuma’s assertions that the special appearance
was not properly verified and that one of the affidavits offered in support of the
special appearance was defective. Yuma argues that, because of these defects,
Sterom’s special appearance constituted a general appearance in the trial court. 
          Texas Rule of Civil Procedure 120a, which governs special appearances,
provides that a “special appearance shall be made by sworn motion.” Tex. R. Civ. P.
120a. Yuma points out that the verification of Emi Donis, attached to the special
appearance, was defective because it was not based on her personal knowledge. 
Similarly, Yuma complains of the affidavit of ValveWorks’s employee Richard
Roberts, which was attached to the first amendment to the special appearance and
offered to support Sterom’s jurisdictional arguments. Yuma contends that the facts
recited in the affidavit were not based on Roberts’s personal knowledge. Although
Yuma objected at the special appearance hearing to the lack of personal knowledge, 
the record does not reflect that Yuma obtained a ruling on these objections. 
          Yuma’s objections to lack of personal knowledge were objections to the form
of the verification and affidavit; thus, they were required to have been preserved in
the trial court. See Rizkallah v. Conner, 952 S.W.2d 580, 585 (Tex. App.—Houston
[1st Dist.] 1997, no writ); see also McDermott v. Cronin, 31 S.W.3d 617, 623 (Tex.
App.—Houston [1st Dist.] 2000, no pet.) (concluding that appellate complaint that
affidavit verifying special appearance was not based on personal knowledge was
waived because not made in trial court); Int’l Turbine Serv., Inc. v. Lovitt, 881 S.W.2d
805, 808 (Tex. App.—Fort Worth 1994, writ denied) (same). Because it did not
obtain a ruling on the objections from the trial court, Yuma’s assertions raised on
appeal regarding lack of personal knowledge have not been preserved. See Tex. R.
App. P. 33.1. 
          Yuma also points out that Sterom’s first and second “amendments,” which
supplemented rather than supplanted its original special appearance, were not
verified. Yuma did not specially except or otherwise object to these deficiencies,
thereby waiving them on appeal. See id.; see also Fountain v. Burkland, No.
03-01-00380-CV, 2001 WL 1584011, at *3 (Tex. App.—Austin December 13, 2001,
pet. denied) (not designated for publication) (holding that lack of special exception
or objection regarding unverified special appearance waived complaint on appeal). 
Importantly, the Supreme Court of Texas has held that an unverified special
appearance does not constitute a general appearance and may be amended any time
before the defendant makes a general appearance, even after a ruling on the special
appearance has been made. Dawson-Austin v. Austin, 968 S.W.2d 319, 322 (Tex.
1998); see Zamarron v. Shinko Wire Co., 125 S.W.3d 132, 139 (Tex. App.—Houston
[14th Dist.] 2003, pet. denied) (validating filing of amended verification after notice
of appeal and appellate briefs filed). Thus, any complaint that the special appearance
is not verified must be brought to the trial court’s attention to give the moving party
an opportunity to cure the defect. Fountain, 2001 WL 1584011, at *3. 
          In any event, Sterom’s first amendment contained no substantive argument;
rather, it only supplemented the original special appearance with the Roberts
affidavit. Thus, there were no facts to “verify” in the first amendment. 
          The second supplement to the special appearance was supported not only by
another copy of the Roberts affidavit, but also by the affidavit and deposition
testimony of John Mitchell, Sterom’s former managing director, and several contracts,
including the distributor agreements between Sterom and ValveWorks. 
          Even assuming Yuma’s verification complaint regarding the amendments were
preserved, we must review all of the evidence offered by Sterom in support of its
special appearance to determine whether it was sufficient to support Sterom’s special
appearance. See Exito Elecs. Co. v. Trejo, 142 S.W.3d 302, 307 (Tex. 2004); see
Tex. R. Civ. P. 120a(3) (“The court shall determine the special appearance on the
basis of the pleadings, any stipulations made by and between the parties, such
affidavits and attachments as may be filed by the parties, the results of discovery
processes, and any oral testimony. . . .”). The Supreme Court of Texas clarified in
Exito Electronics that a lack of verification does not automatically make the special
appearance fail; a court must still review the other evidence offered in support of the
special appearance to determine its propriety. 142 S.W.3d at 307.
Standard of Review
          The plaintiff bears the initial burden of pleading sufficient allegations to bring
a non-resident defendant within the personal jurisdiction of a Texas court. BMC
Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 793 (Tex. 2002); McKanna v.
Edgar, 388 S.W.2d 927, 930 (Tex. 1965). A defendant who challenges the trial
court’s exercise of personal jurisdiction through a special appearance bears the
burden of negating all bases of personal jurisdiction. BMC Software, 83 S.W.3d at
793; Kawasaki Steel Corp. v. Middleton, 699 S.W.2d 199, 203 (Tex. 1985).
          Whether a court has personal jurisdiction over a defendant is a question of law. 
Am. Type Culture Collection, Inc. v. Coleman, 83 S.W.3d 801, 805–06 (Tex. 2002);
BMC Software, 83 S.W.3d at 794. Before resolving this question of law, a trial court
must frequently resolve questions of fact. Am. Type Culture Collection, 83 S.W.3d
at 806; BMC Software, 83 S.W.3d at 794. On appeal, the trial court’s determination
to grant or deny a special appearance is subject to de novo review; however, appellate
courts may be called upon to review the trial court’s resolution of a factual dispute. 
Am. Type Culture Collection, 83 S.W.3d at 806; BMC Software, 83 S.W.3d at 794. 
If the trial court does not issue findings of fact, reviewing courts should presume that
the trial court resolved all factual disputes in favor of its judgment. Am. Type Culture
Collection, 83 S.W.3d at 806; BMC Software, 83 S.W.3d at 795. But these implied
findings are not conclusive and may be challenged on appeal for legal and factual
sufficiency when the appellate record includes the reporter’s and clerk’s records. 
BMC Software, 83 S.W.3d at 795. In contrast, we review the trial court’s decision de
novo when the underlying facts are undisputed or otherwise established. AmQuip
Corp. v. Cloud, 73 S.W.3d 380, 384 (Tex. App.—Houston [1st Dist.] 2002, no pet.).
General Principles Governing Personal Jurisdiction
          Two conditions must be met before a Texas court can exercise personal
jurisdiction over a nonresident defendant such as Tri-State: the Texas long-arm
statute must authorize the exercise of jurisdiction and the exercise of jurisdiction must
be consistent with the guarantees of due process. BMC Software, 83 S.W.3d at 795;
Schlobohm v. Schapiro, 784 S.W.2d 355, 356 (Tex. 1990). Because the language of
the long-arm statute is broad, its requirements are considered satisfied if the exercise
of personal jurisdiction comports with federal due process limitations. CSR Ltd. V.
Link, 925 S.W.2d 591, 594 (Tex. 1996). In practice, the two conditions are conflated
into one requirement of due process. Wright v. Sage Eng’g, Inc., 137 S.W.3d 238,
247 (Tex. App.—Houston [1st Dist.] 2004, pet. denied). Thus, the true determinative
inquiry is one of federal constitutional due process. See id.; see also Guardian Royal
Exch. Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex.
1991). 
          Under the Due Process Clause of the Fourteenth Amendment, jurisdiction is
proper if a nonresident defendant established “minimum contacts” with Texas and
maintenance of the suit does not offend “traditional notions of fair play and
substantial justice.” Am. Type Culture Collection, 83 S.W.3d at 806 (quoting Int’l
Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)). The purpose
of the minimum-contacts analysis is to protect the defendant from being haled into
court when its relationship with Texas is too attenuated to support jurisdiction. Am.
Type Culture Collection, 83 S.W.3d at 806; Schlobohm v. Schapiro, 784 S.W.2d 355,
357 (Tex. 1990). Accordingly, we focus on the defendant’s activities and
expectations in deciding whether it is proper to call it before a Texas court. Am. Type
Culture Collection, 83 S.W.3d at 806; Schlobohm, 784 S.W.2d at 357. 
          The minimum-contacts analysis requires that a defendant “purposefully avail”
itself of the privilege of conducting activities within Texas, thus invoking the benefits
and protections of our laws. Am. Type Culture Collection, 83 S.W.3d at 806 (citing
Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S. Ct. 2174, 2183 (1985)). 
The defendant’s activities, whether they consist of direct acts within Texas or conduct
outside Texas, must justify a conclusion that the defendant could reasonably
anticipate being called into a Texas court. Am. Type Culture Collection, 83 S.W.3d
at 806 (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.
Ct. 559, 567 (1980)). A defendant is not subject to jurisdiction here if its Texas
contacts are random, fortuitous, or attenuated. Id. Nor can a defendant be haled into
a Texas court for the unilateral acts of a third party. Id. It is the quality and nature
of the defendant’s contacts, rather than their number, that is important to the
minimum-contacts analysis. Id. 
          Although not determinative, foreseeability is an important consideration in
deciding whether the nonresident defendant has purposefully established minimum
contacts with the forum state. Guardian Royal, 815 S.W.2d at 227. Foreseeability
is not an independent component of the minimum contacts analysis but is implicit in
the requirement that there be a “substantial connection” between the nonresident
defendant and Texas arising from the action or conduct of the nonresident defendant
purposefully directed toward Texas. Id. Individuals must have fair warning that a 
particular activity may subject them to the jurisdiction of a foreign sovereign. Burger
King, 471 U.S. at 472, 105 S. Ct. at 2182; Guardian Royal, 815 S.W.2d at 226. In
other words, an important inquiry in the jurisdictional analysis is whether “the
defendant’s conduct and connection with the forum State [is] such that he should
reasonably anticipate being haled into court there.” World-Wide Volkswagen, 444
U.S. at 297, 100 S. Ct. at 567.
          Although the jurisdiction of Texas courts is always dependent on the
defendant’s having some minimum contacts with Texas, the requisite extent of those
contacts varies depending on the type of in personam jurisdiction sought to be
imposed. Thus, the United States Supreme Court has refined the minimum-contacts
analysis into two types: specific jurisdiction and general jurisdiction. BMC Software,
83 S.W.3d at 795 (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S.
408, 414–15, 104 S. Ct. 1868 (1984).
Jurisdictional Analysis
          In three issues, Sterom contends that (1) the trial court did not have specific
jurisdiction over it because appellees’ claims do not arise from Sterom’s direct
contacts with Texas; (2) the forum selection clause found in one of the distributor
agreements between Sterom and ValveWorks cannot be enforced by appellees
because they are not parties to the agreement; and (3) the trial court did not have
general jurisdiction over it because Sterom’s contacts with Texas were not continuous
and systematic.
A.      Enforcement of the Forum Selection Clause
          Unlike subject matter jurisdiction, personal jurisdiction is a waivable right. 
Burger King, 471 U.S. at 473 n. 14, 105 S. Ct. at 2182 n.14 (1985); Tri-State Bldg.
Specialties, Inc. v. NCI Bldg. Sys., L.P., 184 S.W.3d 242, 248 (Tex. App.—Houston
[1st Dist.] 2005, no pet.). If a party signs a contract containing a forum selection
clause, then that party has either consented to personal jurisdiction or waived the
requirements for personal jurisdiction in that forum. Burger King, 471 U.S. at 473
n. 14, 105 S. Ct. at 2182 n. 14; Tri-State Bldg. Specialties, 184 S.W.3d at 248.
          In this case, United alleged that a forum-selection clause found in a distribution
agreement between Sterom and ValveWorks conferred jurisdiction on the trial court. 
The clause provided that
This Agreement shall be construed in accordance with the laws of
Houston, Texas. All actions and proceedings arising directly or
indirectly or otherwise in connection with, out of, related to, or from,
this Agreement or any transaction covered hereby shall be litigated at
the election and discretion of the parties only in the Court of Houston,
Texas.
          Sterom contends that the forum-selection clause does not apply because the
valve at issue was not sold under the distribution agreement containing the forum-selection clause, but was sold under an earlier distribution agreement between it and
ValveWorks. The earlier distribution agreement governed Sterom’s and
ValveWorks’s relationship from January 1, 2000 until October 31, 2001. Though it
provided that Texas law would apply to disputes under the agreement and that
arbitration would be conducted in Texas, the first distribution agreement did not
contain a clause selecting Texas as a forum for litigation. 
          At the special appearance hearing, Sterom offered an invoice and packing slip
indicating that the valve at issue was sold under the terms of the first distribution
agreement, not the second. In contrast, no evidence indicates that the valve was sold
under the second distribution agreement. Thus, any implied finding by the trial court
that the valve was sold under the second distribution agreement is not supported by
the record. As such, the forum-selection clause found in the second distribution
agreement does not apply and cannot operate to confer personal jurisdiction on the
trial court. 
          Sterom contends that, even assuming that the forum-selection clause applies,
appellees cannot enforce the clause because they are non-signatories to the
distribution agreement. Courts have recognized that a non-signatory must be “closely
related” to a signatory to enforce a forum selection clause. Frietsch v. Refco, Inc., 56
F.3d 825, 827 (7th Cir. 1995); Miele v. Blockbuster Inc., No. 3–04–CV–1228–BD,
2005 WL 176170, at *3 (N.D. Tex. Jan. 26, 2005) (not reported). For example, courts
have concluded that a non-signatory has a sufficiently close relationship for
enforcement purposes if the non-signatory is primarily owned by, or is a successor
entity to, the signatory, or when it is a third-party beneficiary. See, e.g., Hugel v.
Corp. of Lloyd’s, 999 F.2d 206, 210 (7th Cir. 1993) (binding two non-signatory
corporations to forum selection clause because they were 99 and 100 percent owned
by signatory, who was also president and chairman of the board of both entities); Int’l
Private Satellite Partners, L.P. v. Lucky Cat Ltd., 975 F.Supp. 483, 486 (W.D.N.Y.
1997) (refusing to dismiss complaint for lack of personal jurisdiction because, based
on pleadings, it was possible that non-signatory was successor entity to signatory);
Coastal Steel Corp. v. Tilghman Wheelabrator Ltd., 709 F.2d 190, 202–03 (3d Cir.
1983) (permitting enforcement against non-signatory third-party beneficiary). In
contrast, one court has held that a non-signatory plaintiff could not enforce a forum-selection clause against a signatory defendant corporation, even though the signatory
defendant corporation allegedly acted as an agent for the limited liability company
of which the non-signatory plaintiff was a founding member. Miele, 2005 WL
176170, at *3. 
          Here, nothing in the record suggests a “close relationship” between United and
either ValveWorks or Sterom. Rather, the record reveals arm’s-length business
transactions between a manufacturer, its distributor, and downstream customers. 
Such relationships are too attenuated to support appellees’ enforcement of the forum
selection clause against Sterom.
          On appeal, United claims that it is entitled to enforce the forum selection clause
based on two equitable-estoppel theories borrowed from arbitration law. These
theories were discussed by this Court in Phoenix Network Technologies (Europe) Ltd.
v. Neon Systems Inc., 177 S.W.3d 605, 623 (Tex. App.—Houston [1st Dist.] 2005, no
pet.). Under the first theory, a non-signatory may enforce an arbitration agreement
when the signatory plaintiff sues it seeking to derive a direct benefit from the contract
containing the arbitration provision. Id. at 622. Under the second theory, a
non-signatory defendant may enforce an arbitration agreement against a signatory
plaintiff when the plaintiff has sued signatory and non-signatory defendants based on
substantially interdependent and concerted misconduct by all defendants. Id. In
Phoenix, we held that these equitable theories apply to the enforcement of forum
selection clauses. Id. at 623.
          While they may apply to forum selection clauses, these equitable estoppel
theories do not apply to the forum selection clause at issue. The procedural facts
presented in this case do not fall within the rubric of facts necessary to utilize either
equitable estoppel theory. This is neither a case in which a signatory has sued
seeking to derive a direct benefit from the contract containing the forum selection
clause nor a case in which a signatory makes allegations against non-signatories and
at least one signatory based on substantially interdependent and concerted misconduct
by all defendants. See id. at 622. We conclude that, if applicable, United is not
entitled to enforce the forum selection clause. 
          We sustain Sterom’s second issue.
B.      Specific Jurisdiction
          In its first issue, Sterom contends that the trial court does not have specific
jurisdiction over it. Yuma and United (sometimes referred to collectively as
“appellees”) have alleged two bases for specific jurisdiction: the stream of commerce
doctrine and the distributorship agreements between Sterom and ValveWorks.
          1.       Stream-of-Commerce Doctrine
          Appellees alleged that the stream-of-commerce doctrine supports specific
jurisdiction because Sterom reasonably expected its valve to enter Texas. Sterom
contends that the stream-of-commerce doctrine cannot serve as a basis for specific
jurisdiction because the injury in this case did not occur in Texas. 
          In World-Wide Volkswagen, the United States Supreme Court stated, in dicta,
a basis for personal jurisdiction that has come to be known as the
stream-of-commerce doctrine:
[I]f the sale of a product of a manufacturer or a distributor . . . is not
simply an isolated occurrence, but arises from the efforts of the
manufacturer or distributor to serve, directly or indirectly, the market for
its product in other States, it is not unreasonable to subject it to suit in
one of those States if its allegedly defective merchandise has there been
the source of injury to its owner or to others.

444 U.S. at 297–98, 100 S. Ct. at 567 (emphasis added). Here, the valve began its
journey in Romania, passed through Louisiana and Texas, and then returned to
Louisiana as a component in a wellhead. The only forum in which the valve was
alleged to be a source of injury was Louisiana. No allegations have been made that
the valve caused an injury in Texas. Thus, as defined in World-Wide Volkswagen, the
stream-of-commerce doctrine would be relevant to a discussion of whether Sterom
is amenable to process in Louisiana, but not to whether it is amendable to process in
Texas.


 See Kern v. Jeppesen Sanderson, Inc., 867 F.Supp. 525, 536 (S.D. Tex. 1994)
(“The stream-of-commerce theory . . . applies only when the injury occurs in the
forum state.”).
          2.       Distribution Agreements
          Sterom also contends that the distribution agreements cannot serve as a basis
for specific personal jurisdiction. We agree.
          The minimum contacts analysis for specific jurisdiction focuses on the
relationship among the defendant, the forum, and the litigation. Michiana Easy Livin’
Country, Inc. v. Holten, 168 S.W.3d 777, 790 (Tex. 2005). For a court to exercise
specific jurisdiction over a nonresident defendant, two requirements must be met: (1)
the defendant’s contacts with the forum must be purposeful and (2) the cause of
action must arise from or relate to those contacts. Am. Type Culture Collection, 83
S.W.3d at 806. 
          Appellees averred that, through the agreements, Sterom directed and controlled
ValveWorks’s distribution of valves in Texas. Appellees rely primarily on the second
distribution agreement, which gave ValveWorks the exclusive right to market and 
sell Sterom’s products in Louisiana and parts of Texas.


 Yuma asserts that the sales-territory provision and the forum-selection clause evidence that Sterom purposefully
availed itself of the protections of Texas law. United contends that there is “a direct
connection between the distribution agreements, Sterom’s control over the sale of its
valves to Texas customers, the actual sale of the valve at issue, and the damages
suffered by Yuma as a result thereof.” Appellees’ reliance on the second distribution
agreement is, however, misplaced. The record indicates that the valve was sold under
the first distribution agreement, not the second; thus, Sterom’s liability could not arise
from the second agreement. 
          Unlike the second agreement, the first distribution agreement did not
specifically identify Louisiana and parts of Texas as ValveWorks’s exclusive sales
and marketing territory; instead, it defined ValveWorks’s sales territory as the entirety
of the United States and Canada. Beyond the fact that Texas is one of the 50 states
in which ValveWorks was allowed to sell Sterom’s products, nothing in the first
agreement directed ValveWorks to sell the valve to a Texas customer. ValveWorks’s
unilateral act of selling the valve to United in Texas cannot serve to establish a
purposeful contact by Sterom. See Michiana, 168 S.W.3d at 784–85 (emphasizing
that it is the defendant’s contacts with the forum that count, not the unilateral activity
of a plaintiff or a third party). 
          The only hint that Sterom intended to purposefully avail itself of Texas law, as
opposed to the law of the other 49 states, 10 Canadian provinces, and three Canadian
territories, in which it was also allowed to sell, is that the first distribution agreement
provided that it was governed by Texas law and that any arbitration would occur in
Houston, Texas. Though it may be a factor in the minimum contacts analysis, a
choice-of-law provision by itself is insufficient to create personal jurisdiction or put
a defendant on notice that it might be subject to suit in a different forum. Stuart v.
Spademan, 772 F.2d 1185, 1195 (5th Cir. 1985). The Fifth Circuit Court of Appeals
has held that such a “provision contemplates a choice of law not forum.” Id. While
the first distribution agreement also chooses Texas as the forum for arbitration, it does
not evince Sterom’s anticipation of being haled into a Texas court for litigation
purposes, particularly with non-signatories bringing claims based on property
damage. Even taken together, these provisions are not of sufficient quality to show
purposeful availment. 
          In addition, the link between Sterom’s alleged contact with Texas, through the
first distribution agreement, and Yuma’s injury is too remote and attenuated to serve
as a basis for specific jurisdiction. The purpose of the first distribution agreement,
which was between Sterom (a Romanian corporation) and ValveWorks (a Louisiana
corporation), was to allow ValveWorks to market and sell Sterom’s products in the
United States and Canada. After obtaining title to the valve at issue in Romania,
ValveWorks sold it to United, a Texas company, who then sold the valve, as a
component in a wellhead, to Yuma for use in Louisiana, where the valve allegedly
failed causing injury. Appellees appear to allege that the injury in Louisiana never
would have occurred had Sterom not permitted ValveWorks, under the distribution
agreement, to sell the valve to a Texas company, which then sold it as a component
part for use in Louisiana. This type of generalized “but for” relationship between the
forum and a non-resident defendant is not adequate to meet the requirement for
specific jurisdiction that the cause of action must “relate to” or “arise out of” the
non-resident’s activities within the forum. See Michel v. Rocket Engineering Corp.,
45 S.W.3d 658, 671 (Tex. App.—Fort Worth 2001, no pet.) (concluding that
generalized “but for” relationship between forum and non-resident defendant fell
short of requirement that claims “relate to” or “arise out of” non-resident’s activities
within Texas).
          Based on the record, we conclude that the trial court did not have specific
jurisdiction over Sterom in this case. We sustain Sterom’s first issue.
C.      General Jurisdiction
          In its third issue, Sterom contends that the trial court could not exercise general
personal jurisdiction over it because the contacts alleged by appellees were not
continuous and systematic. Appellees contend that Sterom is subject to the trial
court’s general personal jurisdiction because Sterom’s contacts with Texas were
systematic and continuous in nature and that Sterom’s Houston-based sister company,
PCC Flow Technologies, Inc. (“PCC Flow”), acted as Sterom’s agent.
          1.       Sterom’s Contacts Alleged to Support General Jurisdiction
          General jurisdiction is established when a defendant’s contacts in a forum are
continuous and systematic so that the forum may exercise personal jurisdiction over
the defendant even if the cause of action did not arise from or relate to activities
conducted within the forum state. BMC Software, 83 S.W.3d at 796. General
jurisdiction is premised on the notion of consent. Am. Type Culture Collection, 83
S.W.3d at 808. That is, by invoking the benefits and protections of a forum’s laws,
a nonresident defendant consents to being sued there. Id. The minimum contacts
analysis is broader and more demanding when general jurisdiction is alleged,
requiring a showing of substantial activities in the forum state. Guardian Royal, 815
S.W.2d at 228.
          We begin by noting that many of the contacts alleged by appellees as
supporting general jurisdiction occurred after the date on which Yuma contends it
discovered the wellhead leak. This and other Texas courts have determined that the
relevant jurisdictional time frame ends on the date of the injury. See AmQuip, 73
S.W.3d at 388; see also Schott Glas v. Adame, 178 S.W.3d 307, 313–14 (Tex.
App.—Houston [14th Dist.] 2005, pet. denied); MedCost, L.L.C. v. Loiseau, 166
S.W.3d 421, 434 (Tex. App.—Austin, 2005, no pet). Accordingly, we consider and
discuss only those contacts that the record reveals occurred on or before July 24,
2002. 
          Appellees also allege that the distribution agreements establish general
jurisdiction over Sterom. Appellees contend that Sterom should have reasonably
anticipated being called into a Texas court because it knew its products were entering
Texas. Appellees point out that the second distributor agreement gave ValveWorks
the right to sell Sterom’s products in Louisiana and eastern Texas. Despite appellants
contentions, it is not a question of whether Sterom knew that its products would enter
Texas, it is a matter of whether Sterom “consented” to suit in Texas because it
invoked the benefits and protections of its laws. See Am. Type Culture Collection,
83 S.W.3d at 808.
          When a nonresident defendant purposefully structures its business dealings to
avoid the benefits and protections of a forum’s laws, the legal fiction of consent no
longer applies. Am. Type Culture Collection, 83 S.W.3d at 808; see Bearry v. Beech
Aircraft Corp., 818 F.2d 370, 375–76 (5th Cir. 1987). In this case, it is evident that
Sterom structured its transactions with ValveWorks to avoid the benefit and
protections of Texas’s laws. Of particular importance is that title and risk of loss to
Sterom’s products passed to ValveWorks in Romania. John Mitchell, former
managing director of Sterom, testified in his affidavit that Sterom structured all of its
sales such that title passed in Romania. As noted by one court, “This is significant
for jurisdictional purposes because, by ensuring that title passes outside of the forum
state, the nonresident defendant is not invoking the benefits and protections of the
forum’s laws.” Schott Glas, 178 S.W.3d at 317 (citing Am. Type Culture Collection,
83 S.W.3d at 808 and Zamarron v. Shinko Wire Co., 125 S.W.3d 132, 144 (Tex.
App.—Houston [14th Dist.] 2003, pet. denied)). To find personal jurisdiction based
on products entering Texas when the title to such products passes outside of Texas
is “inconsistent with the notion that the nonresident defendant must purposefully avail
itself of the benefits and protections of the forum’s laws to be subject to personal
jurisdiction.” Id.
          Though the second distribution agreement required that ValveWorks report
certain information regarding sales and market conditions to Sterom and required
ValveWorks to service certain accounts, the agreement also made clear that Sterom
and ValveWorks were acting as separate entities. The agreement recited that
ValveWorks was selling Sterom’s products as an independent contractor. The
agreement provided that ValveWorks was not “[an] employee, partner, affiliate, joint
venture, or legal agent of [Sterom]” and that “[ValveWorks] shall not be empowered
or authorized to act for, in the name of, or to bind [Sterom] in any respect.” 
Additionally, ValveWorks employee Richard Roberts testified in his affidavit that
Sterom had no part in deciding to whom or where the valve at issue would be sold. 
Mitchell also testified that Sterom shipped its products to the location selected by the
buyer. By structuring the sales of its products as it did, Sterom did not afford itself
the benefits and protections of the laws of Texas; rather, it sought to avoid them. See
Bearry, 818 F.2d at 376. 
          The only indications in the distributor agreements that Sterom sought the
protections of Texas law are found in the choice-of-law and choice-of-forum
provisions. As mentioned, a choice-of-law provision may be a factor in the minimum
contacts analysis, but by itself is insufficient to create personal jurisdiction or put a
defendant on notice that it might be subject to suit in a different forum. Stuart, 772
F.2d at 1195. Here, the significance of the choice-of-law provision is diminished by
the fact that no allegation has been made that the choice-of-law provision was
invoked by Sterom. 
          Similarly, no indication exists in the record that Sterom invoked the forum-selection clause. Because the forum-selection clause was designed to govern disputes
between Sterom and ValveWorks arising from the distributor agreement, it would
have been invoked only in very limited circumstances. Such clauses create
speculative and contingent contact with Texas, and cannot be considered systematic
and continuous for purposes of establishing general jurisdiction. See Zamarron, 125
S.W.3d at 144 (concluding that agreement to indemnify Texas company, in event of
suit by third party, created speculative contact with Texas that could not be
considered continuous and systematic for purposes of establishing general
jurisdiction). 
          To support general jurisdiction, appellees also cite the following pre-incident
contacts:
•        Six Sterom employees made a total of approximately 20 business trips to
Texas. 
 
•        One Sterom employee was hired in Texas to work in Romania. That same
employee was paid in Houston through PCC Flow, which has its business
office in Houston, Texas.
 
•        PCC Flow assisted in the negotiation of one of the distributor agreements with
ValveWorks.
          Mitchell testified that several of the business trips to Texas cited by appellees
were to meet with Sterom’s parent company to report the state of Sterom’s business
affairs, as part of standard quarterly reviews. Mitchell also testified that a number of
other trips to Houston were to obtain specifications from customers for products
being manufactured by Sterom. Sterom employees also traveled to Houston to attend
the oil technology conference. As described, these contacts with Texas were not
grounded on any expectation or necessity of invoking the benefits and protections of
Texas law. 
          The involvement of PCC Flow in negotiating one of the distributor agreements
between Sterom, a Romanian company, and ValveWorks, a Louisiana company,
without more, does not suggest a purposeful availment of Texas law. Rather, it
suggests that Sterom was utilizing its U.S.-based sister company to assist it with a
U.S. contract. Moreover, the recruitment of one employee in Texas for a position in
Romania appears to have been an isolated act, as does using PCC Flow to pay the
employee. 
          We do recognize, however, that, for general jurisdictional purposes, we do not
view each contact in isolation. Am. Type Culture Collection, 83 S.W.3d at 809. All
contacts must be carefully investigated, compiled, sorted, and analyzed for proof of
a pattern of continuing and systematic activity. Id. (citing Schlobohm v. Schapiro,
784 S.W.2d 355, 359 (Tex. 1990)). Ultimately, we must determine whether Sterom’s
contacts establish a pattern of continuing and systematic activity. Id. In doing so, we
are concerned with the quality of Sterom’s contacts, not the quantity. Id. at 809–10. 
          Here, the quality of Sterom’s contacts do not support general jurisdiction. The
record reveals that, during the relevant time period, Sterom did not advertise or
promote their goods or services in Texas, did not solicit business in Texas,
manufactured and shipped its products from a location outside of Texas, had no
offices, employees, or bank accounts in Texas, and carefully constructed its business
transactions to avoid the benefit of Texas laws. Based on these facts, we are
compelled to conclude that Sterom’s contacts with Texas were not continuous and
systematic. See id. at 810 (concluding that nonresident’s contacts with Texas were
not continuous and systematic when nonresident did not advertise in Texas, had no
physical presence in Texas, performed all its business services outside Texas, and
carefully constructed its contracts to ensure it does not benefit from Texas laws); CSR
Ltd., 925 S.W.2d at 595 (holding that nonresident defendant did not have continuous
and systematic contacts with Texas in case in which defendant: had no offices,
employees, or bank accounts in Texas had not solicited business in Texas; never
owned property and never paid taxes in Texas; and never entered into a contract in
Texas); see also Helicopteros Nacionales de Colombia, 466 U.S. at 416, 104 S. Ct.
at 1873 (concluding that nonresident’s contacts with Texas were not continuous and
systematic even though defendant sent its chief executive officer to Texas for
contract-negotiating session, accepted into its bank account checks drawn on a bank
in Texas, purchased $4 million of goods and equipment from a company in Texas,
and sent employees to Texas for training and technical consultation).
          Analyzing the relevant jurisdictional facts, we conclude that Sterom did not
have sufficient minimum contacts with Texas to subject it to the general personal
jurisdiction of the trial court in this case. 
          2.       Agency
          United also contends that PCC Flow’s contacts with Texas should be imputed
to Sterom for jurisdictional purposes because PCC Flow served as an agent of
Sterom. Sterom contends that United did not offer sufficient evidence to support an
implied finding by the trial court that an agency relationship existed between Sterom
and PCC Flow. 
          As discussed above, a nonresident defendant has the burden to negate all bases
for personal jurisdiction. BMC Software, 83 S.W.3d at 793. One exception to that
rule arises when the claimant asserts that personal jurisdiction exists based on an
alter-ego theory. See id. at 798–99. The Texas Supreme Court has held that
jurisdiction based on an alter ego theory cannot be found unless “[t]he party seeking
to ascribe one corporation’s actions to another by disregarding their distinct corporate
entities [proves] this allegation.” Id. at 798. The underlying reason for shifting the
burden to the claimant is that “Texas law presumes that two separate corporations are
indeed distinct entities . . . .” Id. Though it was reached in the context of an assertion
of alter ego, the holding can logically be extended to the assertion of an agency
relationship between two corporate entities. Thus, we agree with Sterom that it was
United’s burden to demonstrate agency in the trial court. 
          The critical element of an agency relationship is the right to control, and the
principal must have control of both the means and the details of the process by which
the agent is to accomplish his task in order for an agency relationship to exist. 
Coleman v. Klockner & Co. AG, 180 S.W.3d 577, 588 (Tex. App.—Houston [14th
Dist.] 2005, no pet.). Absent proof of the right to control the means and details of the
work performed, only an independent contractor relationship is established. Id. The
distinction between an independent contractor and an agent is important to the
jurisdictional inquiry because the actions of an independent contractor by themselves
are not sufficient to subject a non-resident corporation to the jurisdiction of the forum
state. Id.
          To support its agency theory, United primarily relied on post-incident (i.e.,
after July 2, 2002) occurrences. As discussed, such evidence is not relevant to our
jurisdictional analysis. See AmQuip, 73 S.W.3d at 388. The only pre-incident
evidence remaining is the fact that PCC Flow paid one of Sterom’s employees. Such
evidence alone is less than a scintilla to show that Sterom controlled PCC Flow in any
manner. See BMC Software, 83 S.W.3d at 795 (stating that legal sufficiency
challenge fails if there is more than scintilla of evidence to support the finding). 
Thus, we conclude that United’s agency theory cannot serve to subject Sterom to the
general personal jurisdiction of the trial court. 
          We sustain Sterom’s third issue.
                                                         Conclusion
          We hold that the trial court in this case does not have specific or general
personal jurisdiction over Sterom. Therefore, the trial court erred when it denied
Sterom’s special appearance. Accordingly, we reverse the order of the trial court and
render judgment dismissing appellees’ claims against Sterom. 




                                                   Laura Carter Higley
                                                   Justice

Panel consists of Justices Nuchia, Jennings, and Higley.